**UNITED STATES of America, Plaintiff,**

v.

**William V. MUSTO, Frank Scarafile, John J. Powers, Thomas Principe, Lawrence Dentico, Dominick D'Agostino, Gildo Aimone, Anthony Genovese and John Bertoli, Defendants.**

Crim. No. 81–144.

United States District Court,
D. New Jersey.

May 6, 1982.

As Amended May 12, 1982.

W. Hunt Dumont, U. S. Atty. by Maryanne T. Desmond, First Asst. U. S. Atty., Samuel Rosenthal, James Plaisted, Mark Malone, Richard Friedman, Asst. U. S. Attys., Newark, N. J., for plaintiff.

Irving Anolik, New York City, for defendant William V. Musto.

Dennis McAlevy, Hoboken, N. J., for defendant Frank Scarafile.

Shain, Hayden, Perle, Rafanello, Schaffer & Irish by Joseph Hayden, Newark, N. J., for defendant John J. Powers.

Thomas Ford, Millburn, N. J., for defendant Lawrence Dentico.

Podvey & Sachs by Alan Silber, Newark, N. J., for defendant Dominick D'Agostino.

Sills, Beck, Cummis, Radin & Tischman by Robert Baime, Newark, N. J., for defendant Gildo Aimone.

Flood & Basile by Raymond Flood, Hackensack, N. J., for defendant Anthony Genovese.

Robinson, Wayne & Greenberg by Jack Arseneault, Newark, N. J., for defendant John Bertoli.

Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan by Theodore Wells, Roseland, N. J., of counsel for defendants Musto, Powers, Scarafile and Genovese.

Kunstler & Mason by William M. Kunstler, New York City, of counsel for defendants Dentico and D'Agostino.

SAROKIN, District Judge.

Defendants, alleging that various errors were committed at trial with respect to the jury's deliberations and verdict, seek a judgment of acquittal or a new trial, and hearings of one or more jurors.

The trial of this matter lasted approximately five months. The complex, 46-count indictment, charged defendants with conspiracy to violate the RICO statute, tax fraud, mail fraud, and wire fraud. Throughout the trial, and despite the unanticipated length of the proceedings, the jury

listened attentively to witnesses and displayed unflagging interest in the proceedings. On March 22, 1982, the jury began its deliberations. Two days later, the court received a message from the Marshals that one of the jurors, Mrs. Steidl, was upset. This message was communicated to counsel by the court:

Gentlemen, as I informed you off the record I have received a message from the Marshals that Mrs. Steidl is very upset. She had been crying, she claims that she has never been away from her husband before, and the general indication that I have received is that she has some doubts as to her ability to continue to serve and to participate in the deliberations.

Under the circumstances it is my suggestion that I meet with her informally, off the record, if I have your consent to do that, first of all to find out what the problem is, report back to you as to what it is that she tells me and then if necessary we will put something on the record, if you think that is appropriate, but my feeling is that I will do much better with her if I can discuss the matter with her without a Court Reporter being present and see what the problem is, but I only will do that if you all consent.

If you want a Court Reporter there I will do that as well.

My suggestion is we start informally before we put ourselves in the position from where there is no retreat.

All counsel agreed that the court should informally interview Mrs. Steidl. A message requesting the interview was then sent to the jury with instructions that further deliberations were to cease until notification to resume was given by the court.

The court's conversation with Mrs. Steidl was held in chambers and lasted for only a few minutes. The substance of the conversation was immediately reported to counsel:

THE COURT: Gentlemen, here is what I gleaned from my conversation with Mrs. Steidl:

First of all, I want you to know that when I began talking to her I instructed explicitly to her that she was not to reveal to me anything that had taken place during the deliberations. She indicated to me that the first night she was very upset because she was away from her husband.

Last night she indicated that in addition she was hysterical because of the pressure of the deliberations. Apparently the foreperson had insisted that the jurors support their views and indicated that they should do so before going to dinner last night.

Apparently that direction upset her very much. She said that that pressure is making her sick and she does not think that she can continue to serve as a juror.

After the court related the details of its discussion with Mrs. Steidl to counsel, there was argument over what should be done next. There were suggestions to interview the foreman, to reinstruct the jurors that each of them must vote their own conscience, to allow Mrs. Steidl to meet with her husband, and to interview Mrs. Steidl again to see whether the proposed meeting with her husband would ameliorate the problems which she was having. Defense counsel urged that the court's first obligation was to have another conversation with Mrs. Steidl:

MR. HAYDEN: I submit that you need at the very least another meeting with Mrs. Steidl.

MR. BAIME: And the foreperson.

MR. HAYDEN: Call her down, explain to her your rationale as to why you are not going to excuse her, explain to her if she has to see her husband, if it were important enough—I don't think giving her the—

THE COURT: I'll do it but I don't want to do it formally.

MR. HAYDEN: Doesn't have to be on the record.

MR. FORD: I can't urge more strongly it be done informally.

The court held another informal meeting with Mrs. Steidl at the urging of and with the consent of counsel. The meeting lasted for only a few minutes and its details were

immediately disclosed to counsel in open court:

THE COURT: Gentlemen, I had a second conversation with Mrs. Steidl. The situation has deteriorated rather than improved.

I told her that we would make arrangements to bring her husband down if she wanted, that I would bring the foreperson in and have a chat with him as to his functions and I read to her the portion of the charge which I said I would consider reading to the jury as a whole and to the foreman, and she said to me that she does not wish to continue under any circumstances.

An attorney for the defense then asked the court for time to caucus with co-counsel. The court, granting the request, stated: "I would suggest, gentlemen, there are three choices: One is to go with a jury of eleven, one is to make use of one of the four alternates who are here, and the third I do not wish to speak aloud."

After counsel met, they jointly proposed that the court should excuse Mrs. Steidl and the foreman and substitute two of the alternate jurors. Alternatively, they asked for a 24-hour adjournment to determine whether their clients were financially able to move for a mistrial. Argument ensued, with the prosecution vigorously opposing a dismissal of the foreman:

MR. PLAISTED: No factual record to justifying going into the jury, plucking out Number 1 [the foreman] and say you are dismissed, no basis for it.

We object. It is inappropriate, no precedent for it.

With respect to Juror Number 9 [Mrs. Steidl], there are in essence two choices, one to tell her to go back and deliberate, or two, substitute another juror in unless defense are willing to have deliberations continue with eleven jurors.

Counsel for one of the defendants responded to the government's argument:

MR. MC ALEVY: I couldn't disagree more with the government.

I think certainly if there is the slightest hint of taint on that jury it should be ferreted out right now, and I don't think there's any question about the fact, just from what your Honor has told us, Juror Number 9, the accusation she made about Number 1, I think it is something that should be inquired into not only by the court but by counsel within that limited area but we should have the limited right because if there is a taint on this jury there would be absolutely no choice except for a mistrial.

Other counsel also urged that a hearing should be held to determine whether the pressure Mrs. Steidl was feeling was due to improper conduct on the part of the foreman. Counsel also advised the court that their willingness to excuse Mrs. Steidl and substitute an alternate was conditioned upon excusing the foreman as well. Counsel were then requested by the court to decide whether they would want Mrs. Steidl excused should the request to dismiss the foreman be denied:

THE COURT: Gentlemen, I think I have fairly conveyed to you Mrs. Steidl's position and her indication based upon two conversations with her that she does not think that she can continue, and therefore, I agree with Mr. Plaisted that I would like to know whether under those circumstances from each defendant, whether they want Mrs. Steidl excused, if they do want her excused I would like to know whether or not they want an alternate substituted, or whether they move for a mistrial.

As of this moment I am rejecting the condition that Mr. Fitzgibbon also be excused, but that does not mean that I won't deal with the problem, if there is one, once we decide on Mrs. Steidl.

I will not accept that as a condition for excusing Mrs. Steidl. I think we have to deal with her separately and resolve it.

Counsel responded by again renewing their request for a hearing to determine whether Mrs. Steidl was being improperly pressured by other jurors. The attorneys were divided, however, on whether she should be excused, and those that favored

excusing her refused to agree to substitute an alternate without first having a hearing on the possibility of juror misconduct. None of the attorneys expressed a willingness to proceed with a jury of eleven.

Because counsel were unable to agree upon how to proceed, the court suggested that they meet informally in chambers:

THE COURT: I will suggest that we will be more productive if we meet in my chambers. Let's see if we can't save the five months, the agony, expense to everyone.

The meeting was held but there was still no agreement over how to proceed. However, it was evident to the court that defendants would not consent to a jury of eleven or the substitution of an alternate. Therefore, the retention of Mrs. Steidl as a juror was the only realistic alternative absent a mistrial.

The court, understanding that it had the continuing authorization of counsel, decided to make one final effort to determine if Mrs. Steidl would and could continue to serve. After lunch, the court reported as follows:

THE COURT: Please be seated. Gentlemen, I had a further conversation with Mrs. Steidl.

I indicated to her that it might be necessary for her to continue to serve as a juror and she indicated to me that she would be willing to do so.

I also indicated to her that I would bring the jury down and give them some further instructions. Therefore, I think I have a very simple alternative to give to all counsel and eliminate the numerous variables that we have had so far. Counsel, and I guess this is primarily directed at counsel for defendants, but I will certainly hear from the Government as well, should indicate to me whether they are willing at this stage to consent to substitute an alternate for Mrs. Steidl knowing that it is my present inclination that if they are not willing then I am going to ask her to continue to serve. So I think that simplifies the choice for counsel.

No objection was made to this meeting. In fact, the court was complimented for its decision to ask Mrs. Steidl to continue serving as a juror:

MR. HAYDEN: The court asked us to use some ingenuity and it looks like the ingenuity came from the bench.

The court then read to counsel the instruction that it proposed giving to the jury and granted defendants' request for time to caucus to discuss the new development.

After a brief recess, court resumed. The court asked Mr. Hayden, the attorney for defendant Powers, whether agreement had been reached upon how to proceed. Mr. Hayden revealed that counsel were divided:

MR. HAYDEN: There is not an entire consensus. I think there are two views which I will articulate for at least five or six of the counsel.

Your Honor, on the basis of what the court indicated its conversation was with Mrs. Steidl and the fact that she now feels that she could be a fair and impartial juror, she would not be intimidated, we would have—I will withdraw my motion to dismiss her as a juror subject to the Court giving a strong charge to the jury as to the right of each juror to listen and discuss with each other but to vote their conscience, and more importantly, subject to the Court giving a strong charge, in effect telling the foreman that he is not in any preferred status to anybody else, he must listen and have some respect for the dignity of each juror, he has no right to brow-beat, intimidate, harass anybody else, and among other things, that he cannot require people to marshal the evidence, in effect give a summation, because again the constitutional right to trial by jury is a right to a jury from a cross-section of the community, which means some people are more articulate than others, some people—

Two other defense attorneys, Mr. Arseneault and Mr. Baime, agreed with Mr. Hayden that Mrs. Steidl, who had been sequestered from the remainder of the jury since the court's first conversation with her, should continue to serve as a juror and that a strong instruction should be given to the jury before it resumed deliberations. Mr.

Flood, attorney for defendant Genovese, took another position:

MR. FLOOD: I have some problem with her remaining as a juror but this in no way means I would consent to there being an alternate juror.

Mr. Silber, attorney for defendant D'Agostino, took yet another position:

MR. SILBER: Two positions to put on the record:

First, I would move for a mistrial at this time based on two things: first, I do not believe the Court has the power to substitute an alternate without consent and I would not consent, and secondly, based on the position Mrs. Steidl took this morning, the conversations which were related to us by the Court, and I want to make it clear that I in no way object to the procedure employed, I adopt and support the procedure employed, that the fact that she has been isolated, she has not been in the jury room, and at two o'clock in the jury room we had eleven jurors all together who were instructed not to deliberate, but this raises a question in my mind as to whether all those circumstances being attendant I have sufficient concerns to move for a mistrial at this time.

Mr. Silber later stated that if the court were unwilling to grant his motion for a mistrial, then he would rather have Mrs. Steidl continue as a juror than have her replaced by an alternate. Mr. Flood and Mr. Ford concurred with this position.

Mr. McAlevy, attorney for defendant Scarafile, differed with the positions taken by other defense counsel:

MR. MC ALEVY: I wish to have a *voir dire* of this woman and unless I have that, unless I have it I feel that's a basic right that I have under the circumstances and unless I have that, sir, I certainly will ask for a mistrial, unless I have that right—

Mr. Anolik, attorney for defendant Musto, agreed that a *voir dire* examination should be conducted of Mrs. Steidl but he did not state that he would move for a mistrial in the absence of such an interview.

The court, confronted with the inconsistent positions of the defense, requested the government to state its position:

MR. PLAISTED: Initially this morning before we did research over the lunch hour we had been opposed to the removal of Mrs. Steidl. We opposed meetings between the foreman and your Honor and further meetings between your Honor and Mrs. Steidl.

Our concern stems from a recognition of the principles that seem to go through the cases, that is, there shouldn't be any interference in the deliberative process of the jury, the jury should control their own deliberations.

Case law is fairly clear about that. It is fairly clear about inquiries, it is clear that one removes a juror only because of outside influence or because a juror can no longer continue to deliberate because of health or other such reasons that prevent the juror from continuing to deliberate.

Over the lunch hour we were looking at cases, one of the cases was, we looked at, was the *Gypsum* case which, too, reflected an incident after a long trial where the foreman had requested a meeting with the Court and the Court had the consent of all counsel and said, all right, I'll meet with the foreman, and the Court discussed the case with the foreman briefly, and then later the Supreme Court was concerned about that very meeting, even though it happened with the consent of all counsel.

Under the circumstances—and reversed the case, as I understand it.

Under the circumstances that we are now presented where the defense has asked your Honor to meet with Mrs. Steidl but after having done that, after having pushed your Honor into that position now some of defense counsel are taking the position Mrs. Steidl should not be reinserted, she should be stricken, we are in the position where the Government in order—we have no choice but if some counsel object to her being placed back in the jury box we must also object.

We are concerned about that issue on appeal. And so under those circumstances our position is she should not be placed back in the jury box, but rather, an alternate should be placed in.

What counsel have stood before your Honor and said, and all of them did, we would accept an alternate being placed in the box, an alternate so long as two alternates are placed in the box, so long as the foreman is removed, and there is no cause for removing the foreman, there is no cause for an inquiry, that's improper.

What counsel have said for tactical reasons, we will accept inserting a juror but absent those tactical concessions we will not accept inserting a juror, that's not fair.

The Government is getting whip-sawed by the different tactical decisions of counsel. They have now, by trying to induce these inquiries and asking for more and more inquiries into the deliberative process, have put the Court in an untenable position, have put the Government in an untenable position.

The Third Circuit has specifically allowed, and we found the case over the lunch hour as well, Mr. Friedman did, allowed with the consent of counsel the insertion of an alternate juror.

Having heard the positions of all counsel, the court ruled:

Gentlemen, under these circumstances if any of the defendants are of the view that Mrs. Steidl should be removed there is a way to accomplish that without in any way prejudicing the rights of any of the defendants, namely, by making use of the four alternates who are still here, who have been under my instructions and have continued to be under my instructions not to discuss the case with anyone, not to read anything in the newspapers or watch anything on radio or television.

So the defendants have the opportunity if they want to avail themselves of it [by] making use of those alternates.

They have apparently elected not to do that.

I am satisfied based upon my conversation with Mrs. Steidl, although she is upset, that that upset is such that she still feels that she can return to the jury and act as a fair and impartial juror.

I think I owe to all counsel in this case to conduct a voir dire just as to that.

I have no intention of asking her what has been going on in the jury deliberations, but I think it is appropriate for me to bring her out here and ask her in your presence whether based upon all of the circumstances she feels she can resume her role as a juror and act as a fair and impartial juror.

Any objections?

MR. ANOLIK: Yes, not out here.

MR. HAYDEN: How about in the Court's chambers on the record?

The court granted Mr. Hayden's request and conducted the following *voir dire* examination in chambers:

THE COURT: Now, Mrs. Steidl, you and I have had some conversations today; is that correct?

MRS. STEIDL: Yes.

THE COURT: Now, I have asked counsel to come and meet with you and with me in chambers because we are interested in knowing whether you can continue to operate and function as a juror in this case.

One question I want you to answer is do you feel despite anything that has happened so far that you can continue to be an effective and fair and impartial juror in this case and decide the case in accordance with my instructions?

MRS. STEIDL: Yes.

THE COURT: Gentlemen, let's go back into the courtroom and we will bring the jury and we will get back to our work.

MRS. STEIDL: I most humbly apologize.

THE COURT: That's all right. It is an emotional experience for everybody.

Court resumed shortly after the *voir dire* examination was completed. Each of the defendants confirmed that they had waived

their right to be present during the interview with Mrs. Steidl. The jury was then brought into the courtroom and the following instruction was given with the consent and agreement of all counsel:

THE COURT: Ladies and gentlemen, I apologize for keeping you waiting but during the course of the trial I know you have become used to that.

I am informed that one or more of the jurors have expressed some displeasure with the conduct of the deliberations and believe that undue or unfair pressure [1] may have been brought to bear upon you. I must say to all of you that in a case of this length, size and complexity, one would expect that there would be lively and even heated discussion over the evidence and the issues presented.

I wish to remind you and emphasize that each juror is free to express or not to express him or herself on any of the issues that were presented. That is the very nature of the process.

This is a serious matter and serious discussion will undoubtedly affect each and every one of you, possibly even emotionally. That's to be expected. The foreperson whom you have chosen acts as the chair of your deliberations but as I am sure you all know, I'm sure that he knows his views are equal to each of yours and are entitled to no greater weight.

As you undoubtedly know by now I met with Mrs. Steidl this morning and the only instruction that I gave to her is the previous instruction which I gave each of you which I will now repeat, since it seems to bear on whatever the present situation is.

With respect to your verdict, the verdict must represent the considered judgment of each juror. In order to return a verdict in this matter it is necessary that each juror agree thereto.

Your verdict must be unanimous as to each defendant and each count.

It is your duty as jurors to consult with one another and to deliberate with a view to reach agreement if you can do so without doing violence to your individual judgments.

Each of you must decide the case for him or herself but do so only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations do not hesitate to reconsider your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times that you are not partisans, you are Judges, the Judges of the facts, and your sole interest is to seek the truth from the evidence in this case.

Now, ladies and gentlemen, I would very much appreciate it if you would resume your deliberations in the proper spirit [with] these instructions in mind. I repeat again that the Court and counsel and the parties certainly expect that there will be extensive discussions and that those discussions should be in the appropriate spirit in accordance with these instructions.

So I would request now that the jury return and resume deliberations. Thank you very much.

The jury resumed its deliberations at 2:55 p. m. and retired for the evening at 6:00 p. m. Early the next morning, the jury returned to the courthouse to continue its deliberations. The deliberations continued through the day. Then, at 2:55 p. m., the court received a communication from the jury which was read in open court:

THE COURT: We have received the following communication from the jury:

"We are hopelessly deadlocked," signed by the foreperson.

---

1. Although the jury was instructed that the court had been informed that "undue" pressure was being felt by one or more of the jurors during deliberations, the court did not find any such undue pressure, but only the normal pressure of jury deliberations. This will be dealt with at greater length in the body of the opinion.

I advised both defendants and the Government informally of this note and suggested that everyone discuss it, and I am open to suggestions.

I have some of my own but I would like to hear from counsel first.

Counsel then responded:

MR. HAYDEN: On behalf of all counsel we move for a mistrial.

MR. PLAISTED: The Government objects and asks that the jury be sent back to deliberate further. Obviously this case took a great deal of time. This jury has deliberated a very short time if you take out all of the recesses and time for testimony and the other things and we would ask that the jury be sent back to deliberate.

The court denied defendants' motion for a mistrial and read to counsel its proposed instruction to the jury. Argument ensued over the wording of the instruction. After amendments to the language were agreed upon by all counsel, the jury was brought into the courtroom and the following was read to them:

THE COURT: Ladies and gentlemen of the jury, we have received your note which reads as follows:

"We are hopelessly deadlocked."

I wish to remind you that this case has been conducted over a very lengthy period. So far as your deliberations are concerned, you deliberated a half day on Monday and approximately a half day on Tuesday because of the reading of the testimony of Mr. Christopher, yesterday no more than three hours were spent on deliberations, from about three o'clock to six o'clock, and I received your note approximately at three o'clock today, which means—I don't know whether you continued your deliberations during lunch, but that you could not have had deliberations more than five or six hours today. That means since you have commenced your deliberations there have been only a total of between sixteen to eighteen hours, approximately two days.

Under the circumstances, ladies and gentlemen, I'm going to request that you resume and continue your deliberations. The jury is excused.

The jury continued its deliberations until 6:00 p. m. and then adjourned for the evening. Deliberations resumed at 9:00 a. m. of the next morning, March 26, and continued through the day. The jury had breakfast in the morning, a snack of coffee and pastries, lunch in the afternoon, and coffee in the late afternoon. Throughout this time the jury sent no messages to the court. Then, at 6:37 p. m. the jury sent a note to the court asking for clarification of the evidence on one of the charges. After discussions with counsel, the court responded to the inquiry and ordered the jury to return to the jury room to continue deliberations.

At 6:52 p. m. the jury returned its verdict. At the court's request, the foreman rose to his feet and announced the jury's decision. All eight defendants were found guilty of the crimes alleged in the first count of the indictment. As the verdict on the first count was read, there was a tremendous outpouring of emotion. Mrs. Musto, the wife of one of the defendants, rose to her feet and broke into tears. As the foreman continued to read the verdict, she clutched at her husband over the railing that divides the courtroom and continued to weep. Several of the female jurors, observing Mrs. Musto's reaction to the verdict, then began to cry themselves. The prosecutor asked that the proceedings be delayed until Mrs. Musto had a chance to regain her composure. Several relatives attempted to remove Mrs. Musto from the courtroom but she reacted by tightening her embrace of her husband and by continuing to cry hysterically. The jury found that the defendants were guilty as charged in 36 counts of the indictment. Defendants were acquitted of 9 counts against them. One count had been voluntarily dismissed earlier. On every count of the indictment where the jury returned a verdict of guilty, all defendants charged in that count were found guilty. Similarly, on every count where the jury acquitted one defendant, all defendants charged in that count were acquitted.

After the foreman completed delivering the lengthy verdict, counsel for the defense moved to have the jury polled. No request was made at that time for a poll on individual counts. The court granted their request:

THE COURT: Ladies and gentlemen of the jury, there has been a request to poll the jurors individually. You have heard the foreman announce the unanimous jury verdict. Mr. Meisner will call out your name. If you agree with the verdict as announced by your foreperson you should say 'yes'. If you disagree with the verdict as announced by the foreperson you should say 'no'.

Mr. Meisner? [Court Clerk]

THE COURT CLERK: Mr. Fitzgibbons?

MR. FITZGIBBONS: Yes.

THE COURT CLERK: Ms. Guttorsmen?

MS. GUTTORSMEN: Yes.

THE COURT CLERK: Mr. Fix?

MR. FIX: Yes.

THE COURT CLERK: Josephine Melnick?

JOSEPHINE MELNICK: No.

At this point, pandemonium broke out in the courtroom. Many supporters of the defendants who were present leapt to their feet screaming. People pounded on the benches of the courtroom and some of the defense attorneys pounded on their desks and shouted. The prosecutor then rose to his feet and the following exchange took place.

MR. PLAISTED: Your Honor, I would ask that the courtroom be cleared and I would ask in light of the answer that the jury be sent back to the jury room.

I would ask that the courtroom be cleared.

MR. MC ALEVY: Poll the jury.

MR. PLAISTED: I would ask that the proper remedy at this point is for the jury to return to the jury room and resume deliberations

I would ask that they do so. That's what the instructions call for.

MR. ANOLIK: I ask that the poll be continued first.

MR. PLAISTED: That's not appropriate.

THE COURT: Ladies and gentlemen, it is apparent from the answer that the verdict of the jury is not unanimous. Under the circumstances I request that the jury resume their deliberations.

The jury then filed out of the courtroom. Mr. Hayden made the following observation:

MR. HAYDEN: Judge, it is my understanding from the spectators that one of the jurors wanted to speak to you on the way out.

THE COURT: Correct.

All counsel then met in chambers, where the court elaborated on its response to Mr. Hayden:

THE COURT: Let me [say] something. Mr. Hayden mentioned this, and I want to put it on the record immediately. As the jurors were filing out, Mrs. Melnick turned to me and said she wanted to say something. I held my hand up to her because I certainly didn't want her to blurt something out.

She obviously wishes to communicate with the Court in some way. I look to you for assistance.

Mr. Hayden then stated:

MR. HAYDEN: I'd like it done immediately and I would like it on the record in private. Immediately, because if there is a coercion situation, and if we have a dictatorial foreperson, et cetera, I do not want there to be too much time elapsed before this women gets to the Court.

I think the Court might be proper not to take it then.

Other counsel agreed with Mr. Hayden that the court should speak with Mrs. Melnick immediately. The prosecution disagreed and then the following discussion took place:

MR. PLAISTED: We have a right to put our position on the record.

MR. HAYDEN: That can go after.

THE COURT: Let's not deteriorate.

The first thing to do, unless there is some objection, is a note should go up to Mrs. Melnick asking her if she wants to speak to me. I am not going to insist upon it unless she wants to do it.

I think we ought to do it immediately.

MR. PLAISTED: Object. I don't think we should be intruding in the jury deliberations.

There is no case law supporting it.

What I would ask is that rather—I just don't think there is anything that counsel can cite to you that suggests that there should be an in camera, out of camera, interview of jurors.

I don't think it is appropriate. I think the remedy in these situations when you have a juror who says at the poll that it is not her verdict is that they resume deliberations to see if they can arrive at a unanimous verdict.

Vigorous argument ensued. The court then ruled:

THE COURT: I will write a note to the jury, I'll let you look at it, if you agree we will send it up.

Gentlemen, here is the note I propose sending.

Counsel agreed that the note should be sent asking whether Mrs. Melnick wished to speak to the court or whether the jury wished to continue its deliberations. As the conversation, which had lasted about ten minutes, was concluding, the court received another note from the jury:

THE COURT: We have just received a note from the jury.

The note from the jury reads as follows: "May we continue polling the jury?"

Discussion followed and the court then asked counsel whether they agreed that the polling should be continued:

MR. BAIME: Absolutely.

MR. SILBER: I would ask that the polling continue beginning with Number Five.

MR. PLAISTED: I ask that we start over in doing it. It doesn't make any difference.

MR. SILBER: The question as it came from the jury—

THE COURT: I am going to repoll the jury.

MR. ARSENAULT: Over objection.

MR. SILBER: Over my objection.

MR. ARSENAULT: All defense attorneys.

Counsel then went back into the courtroom and the proceedings resumed:

THE COURT: Ladies and gentlemen, in view of the substantial outburst as a result of the verdict and what occurred I am directing that the courtroom be cleared of all persons other than counsel, defendants themselves, and the press.

Everyone else is directed to leave immediately.

The court noted that it was going to repoll the jury beginning from the first juror. Counsel's only objection was that by starting the poll with juror # 1, instead of continuing the poll with juror # 5, the jury's note was not being read literally. No other objection was made to the repolling. No request was made to have the verdict announced. The jury was then brought into the courtroom. Twenty-five minutes had elapsed from the time that the jury was asked to continue deliberating and the time that they returned to the courtroom with the second verdict. The court addressed the jury:

THE COURT: Ladies and gentlemen of the jury, I have received a note with your request that the polling be continued. I again remind you that each of you will be asked whether you agree or disagree with the verdict as announced by your foreperson.

If you agree you merely say "yes". If you disagree you say "no".

We will start again with Mr. Fitzgibbon.

Mr. Meisner, call the list, please.

Each juror responded "yes". The court then entered judgment:

THE COURT: Thank you. Judgment shall be entered in accordance with the verdict of the jury and the verdict sheet shall be filed with the Clerk.

Defense counsel then made application that the jury not be released until motions were made. The court agreed and the jury was excused temporarily. After the jury left the courtroom, Mr. Baime commented:

MR. BAIME: Judge, I noticed during the whole polling of the jury that—and I think the record should reflect, because there's really no way Mr. Sokol could reflect it on the written record other than by description, but Juror Number Four, Mrs. Melnick, although she answered "yes", put her hands in the air and shrugged and was crying and shook her head and said "yes" in a tone of resignation which I really did not have the impression represented her free will.

I think the record should also reflect that Mrs. Steidl was unable to rise to answer the Court's polling questions, remained seated and was crying and merely sobbed out "yes".

Also I think it was not a true reflection of her free will choice.

Mr. Anolik and Mr. Hayden then requested that the court interview Mrs. Melnick. The prosecutor objected:

MR. PLAISTED: With respect to an interview of a juror about deliberations, it is totally inappropriate.

We oppose it. Certainly without the Court having the benefit of case law, we can provide it by tomorrow morning or the next day or Monday if your Honor thinks it is necessary, but the cases couldn't be more clear. We should not and do not delve into the deliberations of the jury.

With respect to Mr. Baime's observations of Mrs. Melnick, there is no question she is emotionally involved; however, I disagree with his physical observations.

The members of the U. S. Attorney's Office seated at counsel table and behind us also disagree with respect to this description of shaking of the head and the other things that he said.

There is no question that she is emotionally upset, as any juror would be under these kinds of circumstances.

Your Honor, I can't argue more strenuously that it is totally inappropriate. There is no case law to support defense counsel's request. It is impeaching.

What they are seeking to do is lay a record to attempt to impeach a verdict. These cases are very clear, one does not do that.

It is certainly not something that need be done at this moment, if it is to be done at all, and I would resist and at least ask your Honor to give us the opportunity to provide your Honor the case law that I speak of because it is there, it is clear, and the defense has nothing to rely on.

Vigorous argument followed. Mr. Flood remarked:

MR. FLOOD: I want to place on the record it was 7:44 when they came back.

To my knowledge they have not had any dinner. They have been deprived of food since the lunchtime.

After listening to the arguments of counsel, the court offered its own observations and findings:

THE COURT: Gentlemen, first of all I think that the court should make some observations and some findings insofar as this jury is concerned.

When the jury first came out and began announcing its verdict there was tremendous emotional outbreak, particularly and certainly understandabl´ from Mrs. Musto, [and] while the jury was being polled she was visibly crying and holding on to her husband and standing.

Although I took a moment in an effort to see if she could regain her composure and have somebody assist her she refused, again understandably, to leave the side of her husband.

There is no question in the Court's mind that that very dramatic moment had a tremendous impact upon this jury.

When we reached Mrs. Melnick in the poll she said "no". As she was going out she attempted to say something to the Court. I merely held up my hand to her because I didn't want her to say anything except under the proper circumstances.

We then, before there was any further communication with the jury, received a request that the polling be resumed. It was resumed, and all of the jurors indicated that they were unanimous. If there was any time or circumstance under which Mrs. Melnick felt that she still wished to speak to the Court she certainly could have said it at that precise moment. She did not.

Insofar as the jury is concerned, that certainly includes Mrs. Steidl and Mrs. Melnick, you have to be inhuman not to react emotionally to the rendering of the verdict in this courtroom, particularly to the reaction of Mrs. Musto and others.

The jury was upset, but I don't think that that necessitates or requires any finding by the Court that there was any improper conduct on anybody's part.

This has been a difficult case and difficult deliberations. I don't think under the circumstances I have any right to now call down any one or more jurors and begin asking them questions or even suggesting to them that they might want to have some discussion with the Court.

Counsel still insisted that Mrs. Melnick be interviewed:

MR. SILBER: I have not had an opportunity to speak and I would appreciate it if I could get one.

When the Court resumed after there was a request to continue the polling, the Court resumed the polling. I observed what Mr. Baime observed, that there was a shrug, there was an attempt to say something additional, there was a resignation in her "yes" but it was clear to me as just a lay person observed as well as a lawyer that she had something more to say.

When you join that with the fact that she had asked to speak to you and you had raised your hand to her in a negative fashion, that now wasn't the time to speak, when she made that request, when the Court had written out a note to her which was, you asked do you want to resume your deliberations, do you want to speak to me, I can't conceive—

The court responded that an interview would improperly intrude into the deliberative process of the jury:

THE COURT: Mr. Silber, there is only one possible explanation that Mrs. Melnick would give to the Court and to counsel and that is she would say why she voted "no" after they first announced they were unanimous and why she is now voting "yes", and that is so clearly beyond—

Counsel argued with the court's ruling. The court then stated:

THE COURT: I will do this for you. I have ruled on it, we will follow Mr. Plaisted's suggestion, if anyone can satisfy me that I have at this juncture a right to ask this woman what it is she wanted to say, because there is no question in my mind it will be an explanation of her vote, if you can satisfy me, and if it has to be briefed, that it should be done, then I will do it.

I understand defendants' position, but I don't think they have any right, she wants to see me for one reason, and that's to explain her vote, I don't have any right to inquire.

Mr. Baime then stated:

MR. BAIME: Just so my application is clear, the very clear feeling I had was that her response to the poll was not really yes, in other words, when she said "yes" it was a throw away "yes."

I hate to get into linguistics but it was a "yes" which was not a "yes." It was accompanied by a shrug and a nod and a gesture with her hands.

I really don't think it was a yes. I would like the inquiry to be really whether she intended to convey to the Court that indeed she did agree with the verdict.

Counsel continued to object to the court's decision. The court responded:

THE COURT: I have already indicated insofar as I'm concerned the only area that she would go into is why she voted "no" when we were told it was unanimous, a unanimous vote, and then why

she voted "yes". That is so beyond what I am permitted to do, I have to deny the request.

If you can convince me that it is an appropriate inquiry on briefs I'll certainly reconsider it, but as we sit here tonight I just don't think I have the authority to do it.

The prosecutor urged the court to excuse the jury and then continue argument. Mr. Anolik for the first time requested that the jury be repolled on every count of the indictment. Stating that the jury had already been polled, the prosecutor objected. The court then ordered that the jury be brought back into the courtroom. After the jury was seated, the court delivered its final instructions. Mr. Anolik then stated again that he would like to have the jury repolled. The prosecutor objected and the objection was sustained by the court. The jury was then discharged.[2]

## DISCUSSION OF THE LAW

The sixth amendment to the United States Constitution guarantees to all persons the right to a fair and impartial trial by jury. From the start of this trial to its conclusion this court has labored hard to ensure that this fundamental guarantee was faithfully implemented. It was, of course, impossible to have foreseen the problems that arose with the jury. Nevertheless, at that critical stage of the trial as in all other stages of the trial, the court sought guidance from counsel to ensure that its decisions were proper and in accordance with the law. In this motion for a new trial or for an acquittal, counsel renew some of their earlier objections. These objections are properly made and their merits will be dealt with in this opinion. Counsel also raise other objections, however, some of which were not made at trial and some of which are completely at variance with counsel's position at trial. Each will be considered separately.

*Ex Parte Meeting with Juror Steidl*

One instance in which counsel's current position contradicts their former position concerns the court's third meeting with Mrs. Steidl. Counsel argue that they never consented to have the court meet for a third time with the juror and urge that this third meeting was unauthorized. Yet when the record is read in context, the meeting was approved and applauded by counsel for defendants.

The court had first learned that Mrs. Steidl was emotionally upset on the morning of March 24. After advising counsel of the problem, the court suggested that it meet privately with the juror. The court specifically noted, however, that a private meeting would be conducted only if all counsel consented. The court also noted that if counsel wanted a court reporter present at the meeting it would agree to the request. Mr. Silber then responded:

Frankly, I have no trouble saying that you should be able to do it whichever way you want, with a reporter, without a reporter.

None of counsel objected to the court meeting alone with Mrs. Steidl or without a court reporter.

The court held an informal meeting with the juror and immediately reported the details of the discussion to counsel. Counsel were advised that Mrs. Steidl was upset because she was away from ₋er husband and because of the pressure of the deliberations. Mrs. Steidl had informed the court that she felt pressured because "the foreman had insisted that the jurors support their views and indicated that they should do so before going to dinner last night." After the court disclosed to counsel the details of its meeting, there was argument about how to proceed. Mr. Hayden urged that "at the very least" another meeting with Mrs. Steidl was necessary and specifically noted that the conversation did not have to be on the record. Mr. Ford emphatically agreed, stating "I can't urge

**2.** The court shall make further findings of fact as they pertain to specific issues hereinafter discussed.

more strongly that it be done informally." None of the defense counsel objected to a second informal meeting between the court and Mrs. Steidl.

After this second meeting was held, the court again immediately reported the details of the conversation to counsel. The court advised the attorneys that Mrs. Steidl did not wish to continue to serve as a juror "under any circumstances" and solicited suggestions from counsel about what to do next. Defense counsel then jointly proposed that the court dismiss both Mrs. Steidl and the foreman and substitute two of the alternate jurors. This proposal, conditioning Mrs. Steidl's dismissal on an agreement to also dismiss the foreman, was rejected by the court. Vigorous argument ensued, with counsel unable to agree upon any course of action which would avoid a mistrial. During the course of a conference in chambers with counsel, it was apparent to the court that counsel would not agree to substitute an alternate or proceed with a jury of eleven. Therefore, unless Mrs. Steidl remained, a mistrial seemed imminent. Accordingly, after reflecting on the matter, the court determined to make a final effort with Mrs. Steidl.

The court conducted the interview informally because of the inhibiting effect that the presence of a court reporter might have on the juror. Moreover, the court understood from counsel's prior positions that an informal meeting was the preferred manner of proceeding. This understanding was confirmed when the details of the meeting were reported to counsel. Mr. Hayden applauded the court for its "ingenuity," and Mr. Silber remarked that he "adopt[ed] and support[ed] the procedure employed." Three other counsel then joined in the remarks of Mr. Silber. None of the defense counsel voiced any objection to any of the court's informal meetings with Mrs. Steidl.[3]

After the court reported the details of its last informal meeting with Mrs. Steidl to counsel, a *voir dire* examination of the juror

was conducted. At Mr. Hayden's request, the questioning was conducted in the court's chambers. All counsel and the court reporter were present for the proceedings. The individual defendants, however, agreed to waive their right to be present. In response to limited questioning by the court, Mrs. Steidl gave her assurance that she could continue to serve as an effective, fair and impartial juror. The hearing was then concluded and proceedings resumed in the courtroom.

Soon thereafter, Mrs. Steidl resumed her place on the jury. The jurors were then summoned to the courtroom, where they received an instruction prepared with the consent and agreement of all counsel. The instruction advised the jurors that given the size and complexity of the case it was expected that "there would be lively and even heated discussion over the evidence and the issues presented." They were also reminded that each of them was free "to express or not to express him or herself on any of the issues that were presented," and that all persons' views, including those of the foreman, were entitled to equal weight. Then, referring to its meeting with Mrs. Steidl, the court fully informed the jury of what was said to her:

As you undoubtedly know by now I met with Mrs. Steidl this morning and the only instruction that I gave to her is the previous instruction which I gave each of you which I will now repeat, since it seems to bear on whatever the present situation is.

The jurors were instructed to be impartial, to consult with one another, to reconsider their own views if erroneous but not to surrender their honest convictions, and to seek the truth from the evidence. The jury was then excused to continue deliberations.

█ The record therefore reveals that counsel never objected to the court's informal meetings with Mrs. Steidl, that counsel explicitly approved of the court's third meeting with the juror, that a formal *voir*

---

3. Defense counsel not only concurred in the procedure followed but were pleased with the result. They undoubtedly viewed Mrs. Steidl as favorable to the defendants and were pleased with her retention on the jury.

*dire* examination assured counsel of Mrs. Steidl's impartiality, and that the jury was instructed precisely on what had been said to the juror during her meetings with the court. Given these facts, the court is somewhat surprised that counsel would now urge that the court's third meeting with Mrs. Steidl was unauthorized and constitutes grounds for a new trial or an acquittal. Defendants waived any objection to the meeting; indeed they approved it and readily accepted its benefits.

The situation here is closely analogous to that in *United States v. Jones*, 542 F.2d 186, 212 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). In *Jones*, counsel had agreed to allow the court to conduct *in camera* examinations of two jurors with only the court reporter present. After defendants were convicted, counsel urged that the examinations were improper. The court held:

> Since, in conducting the *in camera* examinations, the trial judge was merely adopting a procedure suggested to him by counsel for the defendants, it hardly requires discussion that the defendants will not be heard to complain that examinations were conducted *in camera* without the presence of their counsel. *Id.* at 212 (citations omitted)

The Court then stated:

> Even had counsel for the defendants not suggested and, by implication at least, agreed to the procedure followed by the trial court, the very fact that counsel for the defendants knew of the procedure, and neither before nor after the examinations were completed, objected would amount under the authorities to a waiver of any claim of error in regard to the *in camera* examination in the absence of a showing of prejudice. *Id.* at 213. (citations omitted)

Defendants contend that the situation here is not controlled by *Jones*, but rather by *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). In *Gypsum*, even though counsel had acquiesced to the judge's *ex parte* conference with the jury foreman, the Court held that the meeting, under the circumstances of the case, constituted reversible error:

> Because neither counsel received a full report from the judge, they were not aware of the scope of the conversation between the foreman and the judge, of the judge's statement that the jury should continue to deliberate in order to reach a verdict, or of the real risk that the foreman's impression was that a verdict 'one way or the other' was required. *Counsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury be called into the courtroom for a clarifying instruction.* *Id.* at 461. (citations omitted) (emphasis supplied)

The situation here differs from that in *Gypsum* in three fundamental respects. First, here the court made a full report to counsel of its meetings with Mrs. Steidl immediately after the meetings were held. Second, a *voir dire* examination of Mrs. Steidl was conducted with counsel and the court reporter present, at which time the juror assured all that she could and would continue to serve fairly and impartially. Third, and most importantly, any misimpression that the jury might have had of the court's meetings with Mrs. Steidl was cured by the court's instruction to the jury, the language of which had been agreed upon by all counsel. The instruction very explicitly clarified the jury's role and also related to the jury the precise details of the court's discussions with Mrs. Steidl. Because the facts of this case are materially different from those of *Gypsum*, the principle of that case does not mandate the relief sought by the defendants.

Similarly, *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), also urged by defendants as a controlling precedent, is inapposite. In *Rogers*, the court received a note from the jury asking whether the court would "accept the Verdict—'Guilty as charged with extreme mercy of the Court.'" Without notifying de-

fendant or his counsel, the court sent a note to the jury advising "that the court's answer is in the affirmative." *Id.* at 36, 95 S.Ct. at 2093. Five minutes later, the jury returned its verdict of guilty. The court held that because counsel did not become aware of the judge's note to the jury until after the petition for *certiorari* had been filed, the unilateral communication constituted reversible error. *Id.* at 41, 95 S.Ct. at 2095. In reaching its decision, the Court reasoned that "the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise." *Id.*

■ Again, the situation in this case is significantly different. Here, any misconceptions the jury might have had about the court's *ex parte* conferences with Mrs. Steidl were clarified by the court's instruction, the language of which was assented to by all counsel. Moreover, in this case, because the verdict was not delivered until two days after the clarifying instruction was given, any suggestion of coercion is negated. In *Rogers*, on the other hand, only five minutes had elapsed between the time of the judge's communication to the jury and the return of the verdict. Thus, there was compelling reason to believe that the judge's communication had a coercive effect on the outcome of the jury's deliberations.

■ *Rogers* and *Gypsum* thus stand for the proposition that where *ex parte* communications between the judge and jury are likely to have had a coercive effect on the jury's deliberations, the communications will constitute grounds for reversal. These cases do not, however, provide that *ex parte* conversations are *per se* prejudicial error, nor do they provide that counsel may not waive the right to be present during the court's communications with jurors. In fact, what the Court in *Gypsum* found "most troubling" was

that the *ex parte* discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation . . . 438 U.S. at 462, 98 S.Ct. at 2886.

Here, counsel were not only aware of the court's *ex parte* conversations with Mrs. Steidl but had explicitly approved of them. If counsel had any objections to the procedure employed by the court, they had every opportunity to state them. No objections were ever voiced. Instead, counsel lauded the court for its efforts to resolve a critical and extremely delicate situation.

In a situation where the potential for prejudice was far greater than it was here, the Third Circuit also found a waiver, *United States v. Grosso*, 358 F.2d 154 (3d Cir. 1966), *rev'd on other grounds*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). In *Grosso*, the jury sent the judge a note indicating their inability to reach a verdict. Without notice to defendant or his counsel, the judge replied that the jury should continue their deliberations. Counsel voiced no objection to the judge's response. On appeal, the court found that although the judge's communication constituted error, defendant had waived his right to object to the procedure:

[I]f appellant's counsel was of the opinion that the errors were prejudicial it was his obligation to interpose a timely objection and seek corrective action by the Court. . . A defendant may not sit idly by in the face of obvious error and later take advantage of a situation which by his inaction he has helped to create. *Id.* at 158 (citations omitted)

*See also United States v. Jones*, 542 F.2d 186, 213 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976); *Truscott v. Chaplin*, 403 F.2d 644, 645 (3d Cir. 1968).

■ Similarly, this court finds that the defendants have waived their right to object to the court's *ex parte* meetings with Mrs. Steidl. The court also finds that even if there were no waiver, prejudice did not

result from the conversation. The test for prejudice is whether the *ex parte* contact with the juror has likely impugned the integrity of the jury's verdict. *United States v. Williams*, 613 F.2d 573, 575 (5th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980). If any prejudice resulted from the court's meetings with Mrs. Steidl, it was cured by both the *voir dire* examination of the juror, at which she indicated her continued impartiality, and the prophylactic instruction which was given to the jury with the consent of and at the urging of all counsel.

*Order to Continue Deliberating*

■■■■■ Defendants next argue that the court should have declared a mistrial when the first poll revealed that the jury was not unanimous. Rule 31(d) of the Federal Rules of Criminal Procedure specifically provides that where a poll reveals a lack of unanimity on the jury, the judge may either direct the jury to retire for further deliberations or discharge the jury. The judge has discretion to elect between these two alternatives and his decision is entitled to deference on review. *United States v. Smith*, 562 F.2d 619, 622 (10th Cir. 1977). A mistrial will be declared and the jury will be discharged only when such action is justified by "manifest necessity." *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). Application of this standard often requires a balancing of two broad interests: one is the defendant's right to have his trial completed by a particular tribunal, and the other is the defendant's right to a considered judgment of all jurors rather than a judgment resulting from the pressures of "protracted and exhausting" deliberations. *Id.* at 509, 98 S.Ct. at 832. In balancing these interests, many factors are examined:

> These include: (1) a timely objection by defendant, (2) the jury's collective opinion that it cannot agree, (3) the length of the deliberations of the jury, (4) the length of the trial, (5) the complexity of the issues presented to the jury, (6) any proper communications which the judge has had with the jury, and (7) the effects of possi-

ble exhaustion and the impact which coercion of further deliberations might have on the verdict. (citations omitted) *Arnold v. McCarthy*, 566 F.2d 1377 (9th Cir. 1978).

■■■■■ Application of these criteria to the facts of this case affirms that the court did not abuse its discretion in ordering the jury to continue deliberating. First, none of the defendants moved for a mistrial after the jury disclosed that it was not unanimous; nor was there any objection to the court's instruction. Therefore, defendants themselves made a considered decision that it would be better to have the deliberations completed by a particular tribunal than to have the tribunal discharged. *Arizona v. Washington*, 434 U.S. at 509, 98 S.Ct. at 832. Because defendants chose this course, they should not now be heard to complain. The decision in *Government of the Virgin Islands v. Smith*, 558 F.2d 691 (3d Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 486, 54 L.Ed.2d 316 (1977), provides a close analogy. In *Smith*, the trial judge, believing that the jurors were deadlocked, ordered them discharged. To his surprise, he received a telephone call from the foreman one hour later indicating that a verdict had been reached on one count and that it was recorded on a piece of paper located in a drawer in the jury room. Three days later, the jury reconvened, the foreman read the verdict, and all jurors expressed their agreement with the finding. It was not until the matter was appealed that defendant objected to the dismissal of the jury and its reconvention. By then, however, it was too late:

> [I]f there were any procedural defect, the defense's failure to object, either before the verdict was announced or immediately thereafter, constituted waiver. *Id.* at 693.

For similar reasons, this court finds that by not making a timely objection for a mistrial after the lack of unanimity in the verdict was revealed, defendants have waived their right to object.

Even if no waiver were present, however, there are other reasons which support the court's refusal to declare a mistrial. First, the jury had been deliberating for only 30 hours in a trial which lasted for almost five months. Second, the indictment contained 46 counts, some of which were particularly complex. Third, although the jurors had indicated that they were deadlocked a day earlier, all subsequent communications indicated that the deliberations were continuing. Finally, the jurors never indicated that they were exhausted. The court therefore finds that it properly exercised its discretion in ordering the jury to continue deliberating after the poll disclosed a lack of unanimity.

In so concluding, the court's decision is consistent with *United States v. Warren*, 594 F.2d 1046 (5th Cir. 1979) and *United States v. Smith*, 562 F.2d 619 (10th Cir. 1977). In each case, the trial court had ordered the jury to continue deliberating after a poll revealed a lack of unanimity. Both lower court decisions were upheld on appeal, with the court in *Smith* noting:

> [The trial judge] is in a better position than the appellate court to determine the effect of a dissenting or uncertain vote upon the likelihood that further deliberations will yield a freely given verdict. His judgment is entitled to deference. (citations omitted) 562 F.2d at 622.

*Decision to Discontinue Poll After Juror Four Announced Dissent with Verdict*

■ Defendants also allege that the court had improperly refused to continue the poll of the jurors after juror # 4 dissented with the verdict. The cases uniformly prohibit a judge from inquiring into a jury's numerical division. *See, e.g., Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 136, 71 L.Ed. 345 (1926); *Government of the Virgin Islands v. Romain*, 600 F.2d 435 (3d Cir. 1979). The practice of making such inquiries is condemned because it tends to have a coercive effect on jury deliberations:

> It can rarely be resorted to without bringing to bear in some degree, serious although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned. *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 136, 71 L.Ed. 345 (1926).

■ Thus, even where the foreman only reveals the numerical division of the jury, without specifying which number favors conviction, there is reversible error. *Id.*

Defendants argue that neither *Brasfield* nor *Romain* are controlling because both cases dealt with inquiries into the numerical division of the jury before a verdict was returned and neither dealt with the appropriateness of continuing a poll after a juror expressed dissent with the verdict. Defendants reason that if the court had continued the poll, other jurors might have voiced their dissent with the verdict and two salutary purposes might have been accomplished. First, the court, aware of the strength of the dissent, might have declared a mistrial. Second, Mrs. Melnick might not have been "left totally exposed in public as the lone dissenter" and might then not have been pressured to change her vote during the subsequent deliberations.

■ Although defendants' arguments have superficial appeal, they are not convincing. As noted previously, there are many factors considered by a court in determining whether to declare a mistrial. *See Arnold v. McCarthy*, 566 F.2d 1377, 1386–87 (9th Cir. 1978). Never considered, however, is the size of the jury's numerical division and the effect that such a division might have on the jury's continued deliberations. To inquire into the numerical division of a jury is so flagrantly improper, *Brasfield v. United States*, 272 U.S. at 450, 47 S.Ct. at 136, that it cannot reasonably be argued that the judge must assess the magnitude of a jury's numerical division in deciding whether to declare a mistrial.

Equally unpersuasive is defendants' second argument. Under defendants' reasoning, had the court continued the polling, other jurors might have voiced their dissent with the verdict and Mrs. Melnick, because no longer publicly isolated as the lone dissenter, would have felt less pressure to change her vote. This argument is based on nothing more than sheer speculation. One could just as easily envision a scenario where, in response to the defendants' demand that the polling be continued, the remainder of the jurors would have voiced their agreement with the verdict. Mrs. Melnick would then truly have been the lone publicly dissenting juror. Under those circumstances, defendants undoubtedly would contend that, by continuing the polling, the court had improperly inquired into the numerical division of the jury, and had thus publicly exposed Mrs. Melnick as the lone dissenter and had placed such great pressure upon her that she had no alternative but to ultimately change her vote.

 The purpose of polling a jury is to ensure that there is unanimity in the verdict. *United States v. Smith*, 562 F.2d 619, 621 (10th Cir. 1977). Once a juror registers dissent with the verdict, no purpose is accomplished by continuing the poll. In fact, a continuation of the poll will only invite later charges that the court had improperly inquired into the jury's numerical division and had thereby tainted the verdict. It is therefore wisest to discontinue the poll immediately upon learning that the jury's verdict is not unanimous. *See United States v. Warren*, 594 F.2d 1046, 1050 (5th Cir. 1959). The court followed this course and in so doing committed no error. Furthermore, if there had been other dissenters to the verdict, they had the opportunity to express that dissent during the second polling.

### Instruction to Resume Deliberations

 Defendants next contend that the court erred by not instructing the jurors,

when they were ordered to continue their deliberations, that they were free to change their prior votes. Defendants had not objected to the court's instruction at the time that it was given and no other instruction was suggested. Therefore, the right to contest the alleged procedural defect has been waived. *Government of the Virgin Islands v. Smith*, 558 F.2d 691 (3d Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 486, 54 L.Ed.2d 316 (1977). Moreover, it was, in part, the unruly reaction of some counsel to the jury's lack of unanimity that necessitated the jury's prompt removal from the courtroom. Thus, if there were a procedural defect, it was not only waived by counsel's inaction, but was also necessitated by their conduct and the conduct of some of the defendants at the time that Mrs. Melnick voiced her dissent with the verdict.

 Even in the absence of waiver, however, defendants have not been prejudiced by the court's instruction, which stated:

Ladies and gentlemen, it is apparent from the answer that the verdict of the jury is not unanimous. Under the circumstances I request that the jury resume their deliberations.

The jury was thus instructed to continue its deliberations because the verdict was not unanimous. The court had already made it clear to the jurors through its previous instructions that each juror was free to change his or her mind and that for a verdict to be valid it had to be unanimous. Therefore, the jury had been fully instructed on its obligations and defendants were not in any way prejudiced by the court's failure to provide the supplementary instruction, which is urged now for the first time.

### Repetition of the Verdict

 Defendants next argue that because the foreman did not repeat the verdict prior to the repolling of the jury, the verdict is a nullity.[4] This argument ele-

---

4. Although defendants insist that the verdict was a nullity, and that therefore the second poll was meaningless, nonetheless they argue that a poll by counts should have been conducted on the "non-existent verdict."

vates form over substance; it gives no practical significance to the unanimity expressed by the jury upon repolling and it fails to appreciate the context in which the repolling took place and, in particular, the brief time period which had elapsed.

A note had been sent to the court by the jury requesting that the polling be continued. Although defense counsel urged the court to begin the poll with juror five, the court decided that the jury could properly be repolled only by beginning with the first juror. At no time after the court announced that it was going to start the poll anew did defendants request that the foreman repeat the verdict or announce a new verdict. Therefore, again, by failing to interpose a timely objection, defendants have waived their right to challenge an alleged procedural defect. *Government of the Virgin Islands v. Smith*, 558 F.2d 691, 693 (3d Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 486, 54 L.Ed.2d 216 (1977).

■ Even if there were no waiver, however, defendants have not been prejudiced by the foreman's failure to repeat the verdict. Defendants' hypertechnical argument fails to recognize that "much of the rigidity characterizing the common law concept of the jury trial has been relaxed by a more pragmatic approach." *Id.* at 693. Thus, the Supreme Court has held that a verdict was not a nullity even though only eleven jurors were present when it was read, *Humphries v. District of Columbia*, 174 U.S. 190, 19 S.Ct. 637, 43 L.Ed. 944 (1889), and other courts have held that a verdict was valid even where the jury had been previously discharged and was reconvened only to deliver a verdict, *Government of the Virgin Islands v. Smith*, 558 F.2d 691, 694 (3d Cir.), *cert. denied*, 434 U.S. 957, 98 S.Ct. 486, 54 L.Ed.2d 216 (1977), or where jurors had been allowed to disperse after deliberations had begun. *United States v. Piancone*, 506 F.2d 748 (3d Cir. 1974).

When the jurors unanimously responded in the affirmative to the repolling, there is no doubt that the verdict they were affirming was the verdict that the foreman had read aloud only minutes before. In initiating the repolling, the court specifically stated: "I again remind you that each of you will be asked whether you agree or disagree with the verdict *as announced by your foreperson.*" (emphasis supplied). Because only one verdict had been announced by the foreperson, there is only one verdict that the jurors could have been addressing in giving their responses to the poll. This is affirmed by the signed verdict sheet submitted to the court, which corresponds exactly with the verdict initially read by the foreperson.

There can be no question, and the court so finds, that each and every juror, as well as everyone in the courtroom, knew that the jury was being polled on the verdict previously announced. To conclude otherwise would be to totally ignore the realities of the situation as it then existed.

*Continuation of the Poll*

■ Defendants' argument that the court should have continued the poll with juror # 5 is also without merit. The jurors had been returned to the jury room to continue their deliberations because a unanimous verdict had not been reached. They understood and had been instructed that their verdict had to be unanimous before the court would accept it. Thus, when they returned a second time, it was for the clear purpose of announcing a unanimous poll. No other purpose was intended. No other interpretation is reasonable. Moreover, there would have been no reason for the jury to have asked that the poll be continued *unless* Mrs. Melnick had changed her vote.[5]

Even if defendants are correct, however, in arguing that the purpose of the jury's request to continue the polling was to show that there were others who dissented with the verdict, then this purpose would not have been thwarted by starting the poll with juror # 1. Every juror still had the

---

5. Although counsel urged that the jury's request should have been read literally and that polling should have begun with juror # 5, counsel never argued that if the poll did not begin with the fifth juror, no poll should take place.

opportunity to express his or her agreement or disagreement with the verdict. On the other hand, if the court had adopted defendants' suggestion to continue the poll with juror # 5, it would have improperly inquired into the jury's division and would have invited charges of coercion. *See Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 136, 71 L.Ed. 345 (1926) In addition, such a procedure would have deprived the first four jurors of *their* respective rights to change their votes, a right which defendants insist all jurors possessed.

Therefore, no technical definition of the word "continue" in the jury's message is warranted. In effect, the message conveyed that the jury was indeed unanimous as originally indicated and that Mrs. Melnick was now prepared to so indicate. Defendants' strained interpretation is unwarranted.

*Poll of Jury on Individual Counts*

■ Defendants contend that the court improperly rejected their request to have the jury polled on the individual counts of the indictment. There is no absolute right to have a jury polled. *United States v. Shepherd*, 576 F.2d 719, 724 (7th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978). The right exists only where it is seasonably exercised. *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir. 1958). If the request for a poll is not made before the verdict is recorded, it comes too late. *Id.; United States v. Shepherd*, 576 F.2d 719, 724 n. 3 (7th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978).

■ Defendants requested a poll of the jury immediately after the verdict was announced. Although this request was timely made, defendants did not ask at that time that the poll be particularized. Thus, the jurors were only required to state their agreement or disagreement with the verdict as announced by the foreperson. During the first poll, juror # 4 indicated that she did not agree with the verdict as announced. The jurors were then sent back

to the jury room to continue their deliberations.

Soon thereafter, the jury sent a note to the court requesting that the polling be continued. The court advised counsel that it would begin the poll with juror # 1. Although counsel did ask that the polling begin with juror # 5, again, no request was made to have the court conduct a particularized poll. The poll was then conducted and all jurors indicated their agreement with the verdict as announced by the foreperson. The court then entered the verdict and temporarily excused the jury while hearing motions of counsel. It was only after the motions neared the end, and the court was prepared to return the jury to the courtroom to be discharged that counsel asked for the first time that the jury be polled on every count of the indictment. That request was denied.

■ Although defendants urge that the request for particularized polling was improperly denied, the request was not timely made. *United States v. Shepherd*, 576 F.2d 719, 724 n. 3 (7th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978). If defendants thought that the indictment was sufficiently complex to warrant specific polling on each count, then a request for such a poll should have been made at the time that the verdict was originally announced. Defendants had more than ample time to make the request. By waiting until after the verdict was entered, however, defendants waived their right to request a different form of poll than that which was sought originally.

■ Defendants contend, however, that there is uncertainty in the jury's verdict and that *United States v. Morris*, 612 F.2d 483 (10th Cir. 1979), therefore mandates that the court conduct a particularized poll or at least a second poll of the jury. The uncertainty in the verdict allegedly stems from certain gesticulations made by juror # 4 at the time she expressed her agreement with the decision.[6]

---

**6.** The court finds that when Mrs. Melnick assented to the verdict she was crying and had shrugged her shoulders.

This alleged uncertainty, however, differs from the uncertainty present in *Morris.*

In *Morris*, a verdict was returned in which all five defendants were found guilty. When the jury was polled as to each defendant, the foreman stated that he disagreed with the verdict with respect to one defendant. The court then ordered the jury to continue their deliberations on the "last verdict." The jury subsequently returned and advised the judge that it was unable to agree on a verdict for the one defendant. The judge declared a mistrial as to that defendant.

On appeal, the court found that the foreman's disagreement with the verdict for the one defendant, created uncertainty as to the entire verdict. The court held that where the polling revealed uncertainty, the trial judge had an obligation to take remedial action. *Id.* at 491.

The situation here is distinguishable from that in *Morris.* Here, the poll did not reveal the juror's uncertainty with the verdict. Although juror # 4 made certain gesticulations at the time she indicated her agreement with the verdict, the court cannot conclude that these gestures indicated uncertainty with the decision. The court cannot be required to go beyond a juror's verbal response to a poll and determine whether the juror's body language is consistent with the stated response. The judge should be able to accept a juror's response to a poll at face value. If the response itself indicates uncertainty with the verdict, then the court should take remedial action. Thus, where a juror responds to a poll by saying "Yes, with a question mark." *United States v. McCoy*, 429 F.2d 739 (D.C.Cir. 1970), or "It's my verdict but I'm still in doubt." *United States v. Edwards*, 469 F.2d 1362 (5th Cir. 1972), or "I voted guilty to man, but not to God." *United States v. Freedson*, 608 F.2d 739 (9th Cir. 1979), then the court has an objective statement of the juror's uncertainty. But to require the court to evaluate the juror's posture, body movements, and other gestures is to impose a standard incapable of application.

Furthermore, agreement with a verdict does not require pleasure in its announcement. A juror may display unhappiness with a verdict, or reluctance or sadness in its rendition, but still believe in its correctness. A juror may cry over a verdict in which he or she has participated without in any way evidencing disagreement with it. Few jurors relish a finding of guilt. To suggest that tears,[7] a shrug of the shoulders or other body movement should negate or place in question an answer of a juror is to impose upon a court powers of perception which it does not possess and should not attempt to employ. The validity of a poll should depend on what the court hears and not what it sees.

The court therefore is unable to find that the gesticulations accompanying juror # 4's stated agreement with the verdict indicated uncertainty which required remedial action through repolling. In addition, the court finds that individualized polling was unnecessary. This is not a case where on each count some of the defendants were guilty and some were not guilty. Here, where any one defendant was found guilty on a count, all persons accused in that count were also found guilty. Moreover, to accept defendants' argument that a juror expressing agreement with the verdict as announced by the foreperson is not necessarily expressing agreement with the entire verdict is preposterous. The court agrees with the government that, given the manner in which the question was phrased, a juror responding "yes" when asked whether he or she agreed with the verdict as announced, was stating agreement with the entire verdict. On the other hand, a juror responding "no" to the same question might be disagreeing with the verdict in part, yet agreeing in part. It is only in the latter situation that the uncertainty created would require particularized polling. Here, however, all jurors voiced their agreement with the verdict. Therefore, polling on individual counts was unnecessary because there was no uncertainty in the jurors' response to the poll.

7. Mrs. Melnick was crying during the first poll when she answered "no."

## Request for a Hearing

Defendants contend that the court had improperly refused to speak with juror # 4, Mrs. Melnick, when she indicated that she had something to say to the court. To understand why the court responded to her request as it did, one must recall the events of the moment.

When the foreperson began announcing the verdict to a courtroom clearly filled with supporters of the defendants, Mrs. Musto, the wife of the defendant William V. Musto, stood and began sobbing and crying and had her arms around her husband's neck in full view of the jury. The government moved to clear the courtroom, a suggestion which the court rejected. The court did ask, however, if someone would come to the assistance of Mrs. Musto. She refused and she continued through the reading of the long verdict to loudly sob and cry—a moment that had incredible dramatic and emotional impact upon anyone with any feelings in the courtroom. It was in this atmosphere that the jury polling began and Mrs. Melnick indicated her "no" vote. The jurors were then excused because their verdict had not been unanimous; they were requested to resume deliberations.

As the jurors were leaving the courtroom, Mrs. Melnick said, "Your Honor." The court held up a hand to stop her from saying anything further. Although defendants suggest a myriad of possibilities, one can properly assume that Mrs. Melnick intended to explain why she had voted "no", after apparently indicating that she would vote "yes." Counsel and the court then convened and decided that a note would be sent to the jury asking whether Mrs. Melnick wished to meet with the court, or whether the jury wished to continue its deliberations. Before that note could be delivered, a note was received from the jury requesting that the polling continue. No more than ten to fifteen minutes had elapsed.

When the jury was repolled, it was unanimous. Mrs. Melnick, as well as one or two of the other female jurors, were crying, which was certainly understandable in view of the length of the trial, the length of the deliberations, and the tension of the courtroom at the time the verdict was entered, coupled with Mrs. Musto's emotional outburst. Counsel requested that the court permit Mrs. Melnick to be interviewed so that it could determine what it was that she wished to say to the court immediately after casting her "no" vote. Although, concededly, many other possibilities exist, it is most probable that Mrs. Melnick would have explained her "no" vote and for the inquiry to have any meaning, would then have been required to explain why she changed her vote from "no" to "yes." No inquiry could more clearly intrude upon the deliberations of the jury. Mrs. Melnick was instructed by the court, and a copy of the charge was delivered to her setting forth her individual responsibilities. Her right to disagree was clearly enunciated in the charge and repeated in open court. She also knew from reviewing the charge that she had the right to communicate with the court by a written note.[8] She knew from her actual experience that Mrs. Steidl had met with the court. True, when she attempted to speak in open court as she was filing out, she was stopped, but nothing the court did prohibited her from sending a note to the court or, in fact from answering "no," when the jury was once again polled.

In essence, the defendants claim that pressure was brought to bear upon Mrs. Melnick based upon her change of vote and from her demeanor when she subsequently agreed to the verdict. As a result, the defendants seek to inquire of Mrs. Melnick what it is that she wished to say to the court. She took an oath; she knew her obligation; and the court must assume that she would abide by her oath. Neither a juror's change in position nor display of emotion should permit this court or any other court to inquire of a juror why he or she took a particular position or why he or

---

**8.** The court had instructed the jury: "... please remember no member of the jury should ever attempt to communicate with the court by any means other than a signed writing ...."

she changed position at any time during the course of deliberations.

During the course of jury deliberations there are numerous pressures which are brought to bear upon the jurors, particularly those who find themselves in a minority position. *See Smith v. Brewer*, 444 F.Supp. 482 (S.D.Iowa), *aff'd*, 577 F.2d 466 (8th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978). It is unthinkable that such pressures would not exist, and they undoubtedly multiply as the size of the minority diminishes. One would expect that those in the majority would argue and shout in an attempt to persuade those in the minority to accept the views of the majority. The size of the jury room itself, the length of time of the deliberations, coupled with the length of time of the trial, all create pressures as well.

What constitutes pressure to one person will not necessarily constitute pressure to another. For instance, one of the alleged sources of pressure was the insistence that a dissenting juror express him or herself in support of the position taken. Counsel argued that a juror should be free not to express support for a position and the court so instructed the jury at the request of defense counsel. However, on reflection, even that instruction was probably an improper intrusion into the jury process. Certainly, the jurors have a right to insist that a position be supported. A juror taking a minority position might feel pressure if required to explain the position taken, but no one could seriously contend that such a demand by a foreperson or a majority of the jurors constitutes unfair or undue pressure upon a juror. There is nothing before the court which would justify a finding that any type of undue or unfair pressure was brought to bear upon any juror. Furthermore, the jurors were advised that they could communicate, either individually or collectively or through the foreperson, with the court in writing. No such communication was received. They were also instructed as to the limited role of the foreperson and the equality of his position with other jurors.

The jury process has traditionally been secret and for valid reasons. The policy encourages free and open discussion among jurors, promotes verdict finality, and maintains the integrity of the jury as a judicial decision-making body. *cf. Government of the Virgin Islands v. Gereau*, 523 F.2d 140, 148 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). These same interests, which are protected by the policy of secrecy surrounding deliberations before a verdict is reached, are also reflected in Rule 606(b) of the Federal Rules of Evidence, which prohibits the impeachment of verdicts. Thus, despite defendants' claims to the contrary, some of the values underlying the rule against impeachment of verdicts are also implicated where a juror, prior to reaching a verdict, seeks to speak with the judge.

The policy against conversing with jurors prior to the entry of the verdict is most evident in the cases dealing with the polling of jurors. Those cases firmly establish that

It is both unwise and undesirable that the court should enter into an argument with the juror or require an explanation of his change of position. To an even greater degree is it improper to allow counsel to interpose and question the reasons or motives of the juror in changing his mind. *Bruce v. Chestnut Farms—Chevy Chase Dairy*, 126 F.2d 224, 225 (D.C.Cir.1942).

Thus, where a juror changed her vote and was later polled, the judge properly refrained from asking the weeping juror whether any "undue influence" had been exerted on her. *United States v. Freedson*, 608 F.2d 739 (9th Cir. 1979). Similarly, where a juror asked to approach the bench when questioned by the judge during a poll, the judge properly refused to honor her request. *United States v. Smith*, 562 F.2d 619, 620 (10th Cir. 1977). And, where jurors gave the judge a note requesting leniency immediately after they were polled, the judge appropriately refused to conduct an inquiry:

Making inquiries of the jury, as the defense requested, is not to be encouraged because it threatens the secrecy of jury deliberations and invites charges of coercion and interference with the jury function by the trial judge. Responses by individual jurors are unpredictable, and a dialogue, once begun, is often difficult to stop before it causes damage. *United States v. Lee*, 532 F.2d 911, 915 (3d Cir.), *cert. denied*, 429 U.S. 838, 97 S.Ct. 109, 50 L.Ed.2d 105 (1976).[9] Because questioning of jurors may easily intrude into the deliberative process and invite charges of coercion, *United States v. Sexton*, 456 F.2d 961 (5th Cir. 1972), such questioning should be avoided unless there is strong evidence of impropriety.

■ Just as pre-verdict inquiries of jurors should be avoided whenever possible, so should post-verdict inquiries. The rule against the impeachment of verdicts was formulated almost 200 years ago in *Vaise v. Delaval*, 99 Eng.Rep. 944 (1785). In *Vaise*, it was alleged that the verdict should be set aside because the jury tossed a coin to decide which party prevailed. An affidavit, submitted by one of the jurors describing the impropriety, was refused by Lord Mansfield who noted: "[I]n every such case the court must derive their knowledge from some other source: such as from person having seen the transaction through a window, or by some other means."

■ The rule formulated in *Vaise* has also been adopted by the courts of this country. *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). It is no longer so rigidly applied, however, as it once was. *United States v. Grieco*, 261 F.2d 414 (2d Cir. 1958), *cert. denied*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959). Today, reception of a juror's statement as evidence is prohibited only where it is offered "to show matters which essentially inhere in the verdict itself." *Government of the Virgin Islands v. Gereau*, 523 F.2d 140 (3d Cir.

1975), *cert. denied*, 424 U.S. 917 (1976). A juror may testify, however, "to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Mattox v. United States*, 146 U.S. 140, 149 (1892). This modern formulation of the rule and of its exception has been codified in Rule 606 of the Federal Rules of Evidence.

■ The cases clearly establish that evidence of discussions among jurors and intimidation or harassment of one juror by another, are among those matters which "inhere in the verdict itself" and are therefore inappropriate for judicial inquiry. *Government of the Virgin Islands v. Gereau*, 523 F.2d 140, 150 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). Yet it is precisely these matters that form the basis for defendants' request for a hearing. Defendants attempt to circumvent application of the rule by arguing that a hearing is necessary to determine whether what Mrs. Melnick wished to say falls within the prohibition of Rule 606.

■ Defendants' approach is clearly improper. Before defendants are entitled to a hearing they must produce evidence of misconduct which is not barred by the rule of juror incompetency. *United States v. Eagle*, 539 F.2d 1166 (8th Cir. 1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977). They must then establish the existence of grounds recognized as adequate to overturn the verdict. *Government of the Virgin Islands v. Gereau*, 523 F.2d at 148. If defendants are seeking to establish a juror's incompetence, "only strong evidence that it is likely that the juror suffered from such incompetence during jury service will justify an inquiry into whether such incompetence did exist." *United States v. Dioguardi*, 492 F.2d 70, 78 (2d Cir.), *cert. denied, sub nom. Ostrer v. United States*, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).

---

**9.** The court's conversations with Mrs. Steidl demonstrate the wisdom of the Third Circuit's admonition. Although the juror was specifically instructed not to comment on the delibera-

tions, she revealed to the court the pressures she allegedly was feeling from the deliberative process.

Defendants have offered neither proof of juror misconduct nor proof of juror incompetence, yet they seek a hearing to determine whether there are reasons to overturn the verdict. Such an inquiry would necessarily intrude into the sanctity of the jury's deliberations and is improper. In addition, this is not a case where juror incompetence, *United States v. Pleva*, 66 F.2d 529 (2d Cir. 1933), or juror bias, *United States v. Hockridge*, 573 F.2d 752 (2d Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978), or some other impropriety was evident at trial, *See, e.g., United States v. Kohne*, 358 F.Supp. 1046 (W.D. Pa.), *aff'd*, 487 F.2d 1395 (3d Cir. 1973), which required the court to hold a hearing. The defendants quite properly ask the question: how can improper conduct be discovered, if the court refuses to receive the information? But the courts throughout our history have decided that the constitutional rights of the accused are better protected by nondisclosure rather than disclosure of jury deliberations. The policy of jury secrecy is so firmly ingrained in our system that only strong evidence of impropriety warrants inquiry. There is no strong evidence of impropriety in this matter, and it is not appropriate to conduct an inquiry to determine if it exists. Not all attempts by jurors to speak with the court must be turned aside, but a minimum threshold must be met. That threshold has not been met in this matter. The facts must necessitate the hearing: not the hearing provide the facts which justify its own existence. The court therefore concludes that it acted properly in not conducting a hearing at trial and that a hearing at this stage would be equally improper because no evidence justifying such an inquiry has been presented.

CONCLUSION

For the foregoing reasons, defendants' motions for a hearing or a new trial or acquittal are denied.