**Ronald MOSES, Petitioner, Appellant,**

v.

**Raymond A. HELGEMOE, Warden, New Hampshire State Prison, Respondent, Appellee.**

No. 76–1250.

United States Court of Appeals, First Circuit.

Submitted Aug. 30, 1976.

Decided Dec. 22, 1976.

Ronald Moses on brief, pro se.

David H. Souter, Atty. Gen., and Edward N. Damon, Asst. Atty. Gen., Concord, N. H., on brief for respondent, appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This appeal from denial of a writ of habeas corpus presents the question whether the denial of counsel to petitioner at a preliminary hearing on a charge of aggravated assault constituted, on the facts of this case, harmless error, as found by both the Superior and Supreme Courts of New Hampshire and by the district court.

The trial transcript reveals the following. Ronald Moses knew the victim John Hughes socially and had worked for him. Defendant Moses, at a time prior to the incident, had lived with Marion Cassidy. On the day in question, Moses had been driving in a car with his friend Wayne Lowe and probably also with another friend, Robert McLean. Moses met Marion Cassidy while she was out, and asked her if she was seeing the victim, John Hughes. She said no, and Moses said she was not a very good liar. Cassidy told a friend of hers to go over and warn John Hughes. Shortly thereafter, Moses drove up to the place where John Hughes was living with Beverly Cram. His friend Lowe said that Moses went to find Hughes in regard to a business complaint, though the other friend, McLean, confirmed the earlier meeting between Moses and Marion Cassidy. In any event, the friends said that Ronald Moses told them to wait in the car, and he went into the house where Hughes lived. Beverly Cram testified that Moses and Wayne Lowe came to the door; that Moses asked where Hughes was; and that she told him that he was sleeping in an adjoining room. Later testimony by Hughes was that he had been drinking heavily and was sleeping it off. Beverly Cram testified that she then heard Ronnie Moses screaming and hollering; that Moses left the room and then said he would be back the next morning to kill him.

Cram continued that within fifteen to forty-five minutes, Ronnie Moses returned, and that when Hughes answered the door, "Ronnie punched him in the face and knocked him down and then he started kicking him with his feet." Further, that after the first kick John Hughes passed out. Moses continued to kick him four to five times more, and then sat on Hughes' chest, with Hughes lying on his back, "and started punching him in the face with his fists." At that point, Bob McLean came in, and McLean and Wayne Lowe pulled Moses off of Hughes.

Lowe's testimony was that, on Moses' second visit to Hughes, he entered the premises a few minutes after Moses, found a fist fight in progress, with both men "throwing punches", Hughes, however, being on his back on the floor. Lowe's main concern was to get Moses out of the house, which he did with the help of McLean. Lowe urged Cram to have a doctor see Hughes, since, as Lowe testified, Hughes' nose was badly smashed, he was bleeding from his mouth and nose, was groggy, and his eye was puffed up. McLean's testimony was that when he entered the house sometime after Lowe, upon hearing "someone holler", he saw Hughes on the floor, did not know if he was conscious or not, and grabbed one of Moses' arms to help escort him out.

A police officer, who came on the scene shortly after the fracas, described Hughes' profuse bleeding and said that Hughes appeared to have been drinking heavily. A doctor itemized his findings as to Hughes' condition: bruises, discoloration, and swelling over all the face; hemorrhage in the right eye; fracture of the nose; fracture of the bone beneath the right eye; fracture of the right side of the jaw; fractures of the upper jaw; both eyes closed. Hughes underwent a corrective operation and was confined to a hospital for twelve days.

We have set forth the testimony in some detail since we are engaged in assessing whether or not the denial of counsel was harmless error. While none of the three courts which have determined this issue have explicitly stated where the burden of proof lies, we shall assume, without deciding, that the burden lay on the state. *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) is silent on this point,

but the opinion invokes *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which clearly puts the burden to demonstrate harmlessness on the state beyond a reasonable doubt. *Id.* at 24, 87 S.Ct. 824.\* In making our assessment, we shall follow the principle we enunciated for such cases as this in *Chin Kee v. Commonwealth of Massachusetts*, 407 F.2d 10, 14 (1st Cir.), *cert. denied*, 395 U.S. 982, 89 S.Ct. 2143, 23 L.Ed.2d 770 (1969):

> ". . . a reviewing court is permitted to scrutinize the possibility of prejudice arising from the diminution of tactical alternatives available to subsequently appointed counsel and, if such possibility is found beyond a reasonable doubt merely speculative or hypothetical, to declare the absence of counsel harmless error." *Id.* at 14.

The district court properly addressed itself to the functions counsel would perform at a preliminary hearing, *Coleman, supra*, 399 U.S. at 9, 90 S.Ct. 1999. As to the first, the possibility that counsel could expose such weaknesses in the state's case that the accused would not be bound over, the court relied on the facts of subsequent indictment and conviction. These, however, cannot be the determinants, or the standard would be meaningless. Perhaps the court had in mind that at least some of the evidence we have summarized had been introduced at the preliminary hearing and that appellant's failure at trial to undermine the state's case was a fair indication that he would clearly have been unable to prevent the state from meeting its lesser burden at the preliminary hearing. In any event, we think that the court's conclusion as to this function was correct. The judge who presided at the preliminary hearing felt that "this was not a close case". Defending counsel at trial stated that at best he felt that the case was "defendable". We conclude that it seems extremely unlikely that there was any chance that the case would not be bound over to a grand jury.

Three other functions that counsel generally carry out at preliminary hearings are making a case for an early psychiatric examination, conducting discovery, and developing a basis for later impeachment of witnesses. The first of these is not relevant here and discovery was fulfilled in another manner, by the then unusual action of the state in turning over its file, with all of the statements of witnesses to be called to testify, to defense counsel several days in advance of trial.

The inability of counsel to perform the final function, that of "fashion[ing] a vital impeachment tool for use in cross-examination", *Coleman, supra*, 399 U.S. at 9, 90 S.Ct. at 2003, remains to be weighed for possible prejudice or lack thereof. We do not know whether the victim was at the preliminary hearing. Presuming the strongest circumstances favoring the appellant, we will speculate that Beverly Cram did testify at the hearing and that the state's case relied on her. She alone testified at trial as to certain facts, viz. that Moses had said after his first visit that he would return to kill Hughes, that Moses kicked Hughes, and that Moses continued to punch Hughes after he had passed out. But as to the remaining evidence there was no disagreement: that it was Moses who initiated the encounter, indeed returned after an interval; that Hughes had been drinking; that he was in his bedroom; that shortly after the altercation started, Hughes was on his back on the floor; that Moses' companions' chief concern was to pull him away; and that Hughes had been brutally beaten and had suffered many injuries to his face. Moreover, the statement which Cram had given the police shortly after the event had been given to defense counsel. At a state post-conviction hearing that counsel testified: "I would say the testimony at the trial was along the lines I expected from looking at the documents handed to me by the County Attorney."

---

\* We are aware that the separate opinions of Mr. Justice Harlan, *Coleman, supra*, 399 U.S. at 20–21, 90 S.Ct. 1999, and of Mr. Justice Stewart, *id.* at 28–29, 90 S.Ct. 1999, reveal some uncertainty on this point.

In order for us to say that petitioner was prejudiced by not having counsel at the preliminary hearing to lay a basis for impeachment by his examination, we would have to assume (1) that while Cram's trial testimony was consistent with the statement she had given the police, she had given a different version at the preliminary hearing, and (2) that the differences between the preliminary hearing testimony and that in the statement and trial testimony might have been so significant as to have laid the ground for an impeachment which could have changed the final result. Were we to find these assumptions called for, under the circumstances of this case, we would in effect be declaring a per se rule. For it would always be possible to speculate that something might have been accomplished by counsel at a preliminary hearing that could have changed the final verdict. But we have identified no area of possible prejudice other than that where the "possibility is found beyond a reasonable doubt merely speculative or hypothetical". *Chin Kee, supra,* 407 F.2d at 14. We agree with the New Hampshire courts and with the district court that error was harmless.

*Affirmed.*