**Charles M. SIVERSON,**
**Petitioner-Appellee,**

v.

**Michael O'LEARY and Neil F. Hartigan,**
**Respondents-Appellants.**

No. 84–1270.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1984.

Decided June 10, 1985.

Robert A. Morelli, Telford & Morelli, La-Salle, Ill., for petitioner-appellee.

Mark L. Rotert, Chief Crim. Appeals Div., Chicago, Ill., for respondents-appellants.

Before FLAUM, Circuit Judge, PELL, Senior Circuit Judge, and WISDOM, Senior Circuit Judge.*

FLAUM, Circuit Judge.

Respondents appeal from a district court order granting Charles M. Siverson's petition for a writ of habeas corpus on the ground that his trial counsel's absence from the courtroom during jury deliberations and the return of the verdicts at his trial deprived him of effective assistance of counsel in violation of the Sixth Amendment. For the reasons set forth below, we reverse.

## I.

On November 6 and 7, 1979, petitioner Siverson was tried by a jury in Livingston County, Illinois, on an eight-count indictment charging him with theft, robbery, armed robbery, aggravated battery, and armed violence. The proof at trial showed that Siverson and an accomplice, Timothy Childers, met a person named Robert Bolig at a bar in Streator, Illinois, on the night of July 10, 1979. Siverson later persuaded Bolig to leave the bar with him and Childers for the supposed purpose of driving to a party. Siverson instead drove his car out into the country, where he and Childers hit Bolig on the head with beer bottles and stole approximately $100 from his wallet. Childers, who testified against Siverson at trial, stated that in addition to hitting Bolig on the head with a beer bottle, Siverson continued kicking him in the face with his boots after Bolig had fallen to the ground. Siverson's theory of defense, which he testified to at trial, was that although he met Bolig briefly at the bar, he left soon thereafter without Bolig and had returned to his home by the time that the attack occurred. The jury acquitted Siverson on five of the counts, but convicted him on one count

each of theft, robbery, and aggravated battery. The judge thereafter sentenced him on the robbery and aggravated battery counts to concurrent terms of twelve and ten years, respectively.[1]

Siverson's claim for habeas relief relates exclusively to the proceedings that occurred after the jury retired to deliberate on the second day of his trial. Siverson's appointed trial counsel left the courtroom after the jury retired and was absent throughout the jury deliberations and at the return of the verdicts.[2] Although, as described below, Siverson declined invitations by the trial judge to speak with his counsel at two specific points during counsel's absence, he did not otherwise waive his counsel's presence during these proceedings on the record. The government was represented at various points during these proceedings by Livingston County State's Attorney C. David Vogel and Assistant State's Attorney Donald Bernardi.

The transcript of Siverson's trial indicates that closing statements had been completed and jury instructions given by 5:42 P.M. on November 7. At that time, the trial judge told the jury that he would send them to the deliberation room with copies of the instructions and the exhibits introduced at trial, and that they could then elect a foreperson and commence their deliberations. The judge also told the jurors that he would direct the bailiffs to take them to dinner at 6:00 P.M., and warned them not to deliberate while they were outside the deliberation room. The judge concluded by telling them to "[h]ave a relaxing dinner and then return to the Court House and you may then commence your deliberations in the privacy of the Jury Deliberation Room." The record does not reveal how much time the jurors spent at dinner or when they recommenced their deliberations.

---

* The Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

1. The state court record does not reveal why the trial judge did not sentence Siverson on the theft conviction.

2. Defense counsel was present, however, at Siverson's sentencing hearing on December 19, 1979.

The next entry in the record shows that at about 9:10 P.M. the judge received a request from the jury to have the testimony of two prosecution witnesses read back to them. The judge stated that he had informed the jurors that he would consult with the prosecution and defense about the request. Accordingly, the judge questioned Vogel and Bernardi in the courtroom, and contacted Siverson's counsel by telephone, and none of them objected to the request. The judge also offered Siverson himself the opportunity to speak with his counsel by phone, which he declined on the record, and asked him whether he had any objection to the jury request, to which he answered "No, sir." The judge thus brought the jury into the courtroom, and asked them whether they had been able to reach a verdict yet on any of the charges. After the foreperson replied in the negative, the judge informed the jury that no one had objected to their request and had the court reporter read the requested testimony to them. Finally, the judge directed the jury to retire and continue their deliberations.

Immediately after the jury retired this second time, the judge conferred on the record with the prosecution and Siverson concerning how much longer the jury should be allowed to deliberate that evening. The judge stated that it was then 9:45 P.M., and Mr. Vogel suggested that the jury be permitted to deliberate at least another hour. Siverson stated "I have no objection," and the judge, after some additional discussion, said that he would let the jury continue deliberating "for the time being."

The next recorded conference between the judge, the prosecution, and Siverson took place at 11:07 P.M., at which time the judge proposed to have the jury cease its deliberations until the next morning. Mr. Vogel asked whether the judge would first inquire as to whether the jurors would prefer to continue their deliberations fur-

ther that evening. The judge replied that before sending the jurors home he planned to ask them whether they could reach a verdict in "the next ten minutes or so" if they had not reached one already. The judge questioned Siverson about whether he wished "to be heard" on the proposal, and Siverson responded by asking whether the prosecution would be saying anything more to the jury. The judge and Mr. Vogel both responded in the negative, and Siverson said that he had no further comments on the proposal.

At this point Mr. Bernardi intervened to state that the defendant should be made aware of his right to request a mistrial, and to contact his lawyer regarding such a request.[3] The judge asked Siverson whether he wanted to talk with his lawyer, and Siverson in turn asked if the prosecutors were going to ask any questions of the jurors. Bernardi told Siverson that no one could ask the jury questions and Siverson reaffirmed that he had no objection. The judge again asked Siverson if he wanted to talk to his counsel first, but he replied that he did not. The judge then proposed that the jury be brought in and the following colloquy ensued:

MR. BERNARDI: Your Honor, I don't think it is clear that the Defendant knows what a mistrial is and what his rights are at this point.

THE COURT: Well, it is my opinion there would be no cause for a mistrial at this point in that there has been no indication that the Jury is deadlocked and simply that the volume of matters which they have to consider, being eight Counts here, is more than it appears they are going to be able to handle given the lateness of the hour. I don't believe there is a cause for a mistrial with respect to either side at this point.

MR. BERNARDI: Am I correct they have not reported that they are hung yet, that they have not been able to reach a verdict?

---

**3.** Bernardi did not state why he thought a motion for mistrial might be appropriate at this point, but his concern presumably was based on the length of the jury deliberations as indicating a possible deadlock.

THE COURT: They have not so indicated to the Court. The Court has had no indication they are deadlocked.

MR. BERNARDI: Okay.

THE COURT: All right.

Bring the jury in.

The bailiff shortly thereafter returned to the courtroom and reported that the jury would like to have ten more minutes to deliberate. The judge instructed the bailiff to tell the jury "that they could take as much time as they needed to complete their work," and subsequently stated for the record that the bailiff did so.

The record next reflects a pause in the proceedings of unspecified duration, after which time the jury returned to open court. The trial record does not otherwise reveal at what time the following proceedings occurred. The judge asked the jurors if they had reached a verdict, and the foreperson replied that they had. The judge read the verdicts, and then asked whether anyone desired that the jury be polled. Mr. Vogel said that the State did not, but this additional discussion occurred between Siverson's mother (Mrs. Newborn), Siverson, and the judge:

MRS. NEWBORN: We don't know what you mean?

THE COURT: Do you wish to have the Jury polled as to their Verdict?

DEFENDANT: I don't understand.

THE COURT: To determine whether each of the jurors did, in fact, sign the Verdict that reflects their true verdict?

DEFENDANT: No, sir.

THE COURT: Very well.

The judge accordingly entered judgments of conviction or acquittal on the verdicts. Finally, after the jurors left the courtroom, Siverson asked the judge what "charge" the jury found him guilty of, and the judge explained that he was convicted of robbery, aggravated battery, and theft.

Siverson appealed his convictions to the Illinois Appellate Court for the Fourth District on several grounds, including ineffective assistance of counsel based on his attorney's absence during the events described above.[4] That court affirmed in an unpublished order, holding that Siverson had waived his ineffective assistance of counsel claim by failing to raise it in a post-trial motion, and holding alternatively that his attorney's absence during the later stages of the trial was harmless error. The Illinois Supreme Court denied leave to appeal. Siverson then filed a petition for a writ of habeas corpus in the United States District Court for the Central District of Illinois, again raising the ineffective assistance of counsel claim. The district court initially denied the petition on the basis that Siverson had failed to exhaust state remedies. In an unpublished order, however, this court reversed and remanded for the district court to consider the merits of the petition. *Siverson v. DeRobertis*, 705 F.2d 461 (7th Cir.1983).

The district court held an evidentiary hearing on Siverson's ineffective assistance of counsel claim on December 9, 1983. Siverson and his mother testified to the events described above, while providing some additional factual details not contained in the trial record. Siverson said that he had only a third grade education at the time of the trial, and that he never understood the judge's question concerning whether he wished to poll the jury on its verdicts. He also stated that the jury returned the verdicts at about 11:30 or 12:00 P.M., and that as the verdicts were read two women jurors were crying or had tears in their eyes and another woman juror was shaking her head. Siverson's mother testified that just after the jury left the courtroom to begin deliberating, Siverson's attorney told her that he then "had to go home, his son was playing baseball or something, and he had to go home for it." She further stated that neither she nor Siverson understood the question about polling the jury, and corroborated Siverson's testimony that three women jurors were either crying or shaking their heads when the verdicts were read.

**4.** Since the additional grounds are no longer at issue, they will not be discussed herein.

The respondents offered no new testimony at the hearing, and represented to the district court that Siverson's trial attorney had no recollection of the trial and that his testimony would therefore be useless. Siverson's attorney for the habeas proceeding stipulated to the trial attorney's lack of recall regarding the trial. The respondents thus relied solely on the trial transcript.

The district court granted the petition, holding that defense counsel's absence deprived Siverson of effective assistance of counsel at a "vital stage of the proceedings against him." *See Siverson v. O'Leary*, 582 F.Supp. 506, 510 (C.D.Ill.1984). Contrary to the Illinois Appellate Court, the district court stated that it could not "conclude that the presence of defense counsel would not have affected the outcome of the case." *Id.* at 511. Rather, pointing to the unrebutted hearing testimony that several jurors were "visibly upset" at the return of the verdicts, the court concluded that "[i]t is possible that a jury poll would have revealed a coerced verdict." *Id.* Finally, the district court expressed concern over the lack of any indication in the record that Siverson had made a knowing and understanding waiver of his right to the presence of counsel. *Id.* at 512.[5]

## II.

When the district court decided this case, it was unfortunately without the guidance of the United States Supreme Court's recent decision in *Strickland v. Washington*, — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court therein held that in order to establish a Sixth Amendment violation based on ineffective assistance of counsel, a defendant must make a two-part showing: first, that "counsel's performance was deficient" in the sense that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment," 104 S.Ct. at 2064, and, second, "that the deficient performance prejudiced the defense." *Id.* In determining whether a defendant has made the first showing, the Court emphasized, a court should evaluate defense counsel's performance with great deference, and "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 2065–66. As to the second showing, the Court concluded that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," defining a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 2068.

Respondents base their appeal on the contention that petitioner cannot satisfy either of the elements required to establish a Sixth Amendment violation under *Strickland*. Respondents argue first that while defense counsel erred in absenting himself during jury deliberations and the return of the verdicts, his overall trial representation of petitioner was not so deficient as to constitute ineffective assistance under the first prong of *Strickland*. Second, they argue that even if defense counsel's assistance was actually ineffective as a result of his absence during the pertinent period, Siverson nevertheless cannot satisfy the second prong of *Strickland* by showing a reasonable probability that the jury's verdicts would have been different without this ineffectiveness. We shall consider each of these arguments in turn.

### A. Counsel's Ineffectiveness

■ Notwithstanding the strong presumption of reasonableness that attaches to the tactical judgments of defense counsel under the first prong of *Strickland*, we

---

5. On appeal, respondents have not argued, nor could they argue, that Siverson waived the presence of defense counsel during the jury deliberations and the return of the verdicts when the record does not clearly establish a knowing and intelligent waiver. *See, e.g., Martin v. Rose*, 744

F.2d 1245, 1251 (6th Cir.1984); *United States v. Calabro*, 467 F.2d 973, 988 (2d Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); *Spencer v. State*, 85 Wis.2d 565, 571, 271 N.W.2d 25, 28–29 (1978); *Headen v. United States*, 373 A.2d 599, 601 (D.C.1977).

agree wholeheartedly with the district court's conclusion that defense counsel's complete absence during the jury deliberations and the return of the verdicts at petitioner's trial constituted ineffective assistance of counsel in violation of the Sixth Amendment. We begin by holding, as the respondents concede and as every pertinent decision we have found has held, that the jury deliberations and the return of the verdict constitute critical stages of a criminal trial for purposes of the Sixth Amendment. *See, e.g., United States v. Calabro,* 467 F.2d 973, 988 (2d Cir.1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587 (1973); *United States v. Smith,* 411 F.2d 733, 736 (6th Cir.1969); *Spencer v. State,* 85 Wis.2d 565, 570–71, 271 N.W.2d 25, 28 (1978); *People v. Pickett,* 2 Ill.App.3d 560, 564, 276 N.E.2d 751, 754 (1971), *aff'd on other grounds,* 54 Ill.2d 280, 296 N.E.2d 856 (1973). The present case provides a textbook illustration of the various issues that can arise during these stages and which may necessitate the advice and assistance of counsel for the accused, including such issues as jury communications, possible motions for mistrial, and, ultimately, polling of the jurors on their verdicts.

A defense attorney therefore should not lightly decide to leave the courtroom during the deliberations and the return of the verdict, but should do so only after considering very carefully whether the defendant's interests might be impaired by counsel's absence. Nothing in the record indicates that counsel so considered the petitioner's welfare before absenting himself in this case. Rather, the unrebutted testimony of Siverson's mother at the habeas hearing was that counsel told her he was leaving in order to attend his son's baseball game.

■ Even recognizing that a defense counsel's decision to leave the courtroom during ongoing proceedings in a criminal trial might be reasonable under some circumstances—though we have difficulty finding such circumstances here—counsel at a minimum must take sufficient precautions to protect the defendant's interests in his or her absence. The specific precautions that are necessary will of course vary according to the nature of the proceedings involved, but generally must insure that the attorney will at least be available to assist the defendant during any reasonably foreseeable contingency that might arise in the attorney's absence. We can infer from the fact that the trial judge spoke with Siverson's counsel on the telephone concerning the request for testimony submitted by the jury at 9:10 P.M. that counsel had left a telephone number where he could be reached during at least part of the period when he was absent. Nevertheless, since the record is silent on whether Siverson's counsel was available by phone throughout this period or only during some portion thereof, we cannot assume that counsel provided a professionally reasonable substitute for his actual physical presence at the proceedings.

■ Moreover, counsel's availability for consultation by telephone at a number given to the trial judge is adequate only if counsel has also taken steps to insure that he or she will in fact be contacted should any potentially important legal issue arise. It is not enough for an attorney to leave a number where the defendant can contact counsel should the defendant opt to do so. In essence, it is not professionally reasonable for a defense attorney to require a criminal defendant to decide independently whether counsel's assistance is necessary in a particular circumstance. Every lawyer knows that one of the most subtle yet significant ingredients of a lawyer's craft is the identification of legal issues. Competent counsel would not leave such a task to the judgment of the defendant, particularly when the defendant has only a third-grade education.

■ Hence, even if petitioner's counsel was available by phone throughout the jury deliberations and the return of the verdicts, this alone was not sufficient to render his absence professionally reasonable on the facts of this case. Siverson should not have been put in a position requiring him to

decide either 1) whether to request a consultation with his attorney *sua sponte,* as he would have had to do in order to obtain counsel's assistance when the length of jury deliberations was discussed at 9:45 P.M. or when the verdicts were returned, or 2) whether to accept the judge's invitation to speak with counsel, as he was forced to decide when a possible mistrial motion was discussed at 11:07 P.M.

On this record, defense counsel's absence during jury deliberations and the return of the verdicts was not a considered decision "based on strategy," but was instead merely conduct "grounded in negligence." *See Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir.1984). The fact that counsel was present and performed competently during the rest of the trial, which Siverson concedes, does not make up for counsel's nonfeasance during these critical stages of the trial when several foreseeable and potentially significant legal issues arose. As this court recently held in *Young v. Duckworth,* 733 F.2d 482, 483 (7th Cir.1984): "The assistance of counsel, to be fully effective, must be continuous from the time when prosecution begins...." Because the Constitution demands that defense counsel at least provide assistance to the defendant during the critical stages of the trial, we must conclude in this case that Siverson's counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 104 S.Ct. at 2064.

## B. The Test for Prejudice

Respondents' oral argument before this court focused primarily on their contention that petitioner cannot satisfy *Strickland*'s second requirement of showing a reasonable probability that the result of his trial would have been different if defense counsel had been present during the jury deliberations and the return of the verdicts. Respondents correctly note that with respect to this second requirement, the *Strickland* analysis differs fundamentally from the traditional harmless error analy-

sis applied to most types of constitutional error. Under traditional harmless error analysis, the defendant begins by establishing that constitutional error occurred, and the burden then shifts to the state to show that the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under *Strickland,* on the other hand, the defendant essentially must show both that counsel's assistance was deficient and that this deficiency prejudiced the defense before constitutional error is even established based on ineffective assistance of counsel. *Strickland,* 104 S.Ct. at 2067. Regardless of what the district court concluded before *Strickland* was decided, respondents argue, Siverson cannot prove a constitutional violation under *Strickland.*

A careful reading of the Court's opinions in *Strickland* and *United States v. Cronic,* — U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), however, raises substantial doubt as to whether the Court intends to require a defendant to prove prejudice in Sixth Amendment cases such as this one, where the ineffectiveness at issue is the absence of counsel during a critical stage of the defendant's trial. In *Strickland,* for example, the Court discussed and distinguished various "Sixth Amendment contexts" in which prejudice to the defendant is legally presumed. *See* 104 S.Ct. at 2067; *Dillon v. Duckworth,* 751 F.2d 895, 898 n. 2 (7th Cir.1984). The latter situations include cases of "state interference with counsel's assistance," and, most pertinently, cases involving "[a]ctual or constructive denial of the assistance of counsel altogether." *Strickland,* 104 S.Ct. at 2067. Relying in part on the analysis in *Cronic* that is discussed below, the Court in *Strickland* distinguished these latter circumstances on the grounds that prejudice to the defendant "is so likely that case by case inquiry into prejudice is not worth the cost," and that they "involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent." *Id.* With respect

to the kinds of errors by defense counsel that would normally form a basis for an ineffective assistance claim, on the other hand, the "government is not responsible for, and hence not able to prevent" them, they "come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial," and they cannot "be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid." *Id.*

The Court elaborated further on the role of prejudice in resolving various kinds of Sixth Amendment claims in *United States v. Cronic*, 104 S.Ct. at 2046–48, which was decided on the same day as *Strickland.* The opinion in *Cronic* provides that of the various "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," the "[m]ost obvious ... is the complete denial of counsel." *Id.* at 2047. This reference to "complete denial" of counsel, like the statement in *Strickland* alluding to "denial of the assistance of counsel altogether," 104 S.Ct. at 2067, might seem to embrace only those cases in which a defendant is without counsel throughout all the stages of the trial. *See Gideon v. Wainwright*, 372 U.S. 335 (1963). The Court's next statement in *Cronic*, however, negates such a limited interpretation: "The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." 104 S.Ct. at 2067. Moreover, in a footnote to this statement, the Court noted that its prior decisions had "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* n. 25.

■ Although cases in which defense counsel is unavailable during a critical stage of the proceedings bear some similarity to the kinds of situations that raise typical ineffective assistance of counsel claims, our review of the Court's opinions in *Strickland* and *Cronic* convinces us that the Court does not intend for the *Strickland* test to control the former class of cases. The crucial premise on which the *Strickland* formula rests—that counsel was in fact assisting the accused during the proceedings and should be strongly presumed to have made tactical judgments "within the wide range of reasonable professional assistance," 104 S.Ct. at 2066—is totally inapplicable when counsel was absent from the proceedings and unavailable to make any tactical judgments whatsoever. Thus, both *Strickland* and *Cronic* expressly treat cases involving the total lack of assistance of counsel as separate and distinct from cases involving ineffective assistance of counsel. Unlike the vast variety of attorney errors that might give rise to an actual ineffectiveness claim under *Strickland*, errors which "cannot be classified according to likelihood of causing prejudice," 104 S.Ct. at 2067, the absence of counsel at a critical stage—like the "denial of the assistance of counsel altogether," *id.* —constitutes a discrete situation that must be considered at least likely to result in prejudice to the defendant.

■ In a recent case decided under *Strickland* in which defense counsel, while present, totally failed to participate in the defendant's trial, the Sixth Circuit found constitutional error without any showing of prejudice by the defendant. *Martin v. Rose*, 744 F.2d 1245, 1251 (6th Cir.1984). *Cf. Warner v. Ford*, 752 F.2d 622, 625 (11th Cir.1985) (no presumption of prejudice where counsel's silence at trial was a reasonable strategy). In so concluding, the court in *Martin* noted: "The attorney's total lack of participation deprived [defendant] of effective assistance of counsel at trial as thoroughly as if he had been absent." 744 F.2d at 1250–51. *See also Javor v. United States*, 724 F.2d 831, 833 (9th Cir.1984) (decided before *Strickland*, holding "that when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary"). Although the fact situations in these cases appear more

egregious than the circumstances in the present case, they nevertheless illustrate that counsel's actual or constructive absence during the criminal proceedings, unlike most counsel errors, carries a presumption of prejudice to the defendant.

The chief similarity between cases where defense counsel voluntarily becomes unavailable during some part of the proceedings and ordinary ineffective assistance cases is that the constitutional error appears attributable to counsel rather than to some affirmative act of the government through the prosecutor or the court. In this respect, both kinds of cases differ markedly from those cases, cited in the discussion of the denial of counsel in *Cronic,* 104 S.Ct. at 2047 n. 25, in which court rulings prevented defense counsel from fully assisting the defendant during a critical stage of the proceedings. *See, e.g., Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (defendant ordered not to contact counsel during overnight trial recess which was called just before defendant was to be cross-examined); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (defense counsel denied opportunity to give closing statement or summation of evidence).

Nevertheless, while *Strickland* does identify the government's responsibility for the error as a relevant factor in deciding whether to presume prejudice in the Sixth Amendment context, 104 S.Ct. at 2067, nowhere does it suggest that this factor is determinative. Indeed, the Court's opinion in *Cronic* expressly disavows such a suggestion, noting for example that the Court has "presumed prejudice when counsel labors under an actual conflict of interest, despite the fact that the constraints on counsel in that context are entirely self-imposed." 104 S.Ct. at 2048–49 n. 31. Finally, the court is not always without responsibility in situations where a defendant is without the assistance of counsel during a critical stage of the proceedings. Such situations are frequently "easy to identify," *Strickland,* 104 S.Ct. at 2067, and the court can help protect the defendant's rights by at least insuring that the defendant is aware of and understands the right to have counsel present, and, should the defendant then choose to waive this right, obtaining a waiver on the record. *See, e.g., Martin,* 744 F.2d at 1251–52 (trial court "is not helpless before an attorney's threat to withdraw from participation in a trial. For example, the Court can question the defendant to determine whether he understands the implications and consequences of the attorney's proposed tactic and agrees to waive his right to effective assistance of counsel at trial.").

For all these reasons, we conclude that a defendant need not affirmatively prove prejudice under the second prong of the *Strickland* test in order to establish a Sixth Amendment violation based on the lack of defense counsel's assistance at a critical stage of the criminal proceedings. We hold instead that the proper standard for determining the prejudice resulting from the erroneous absence of Siverson's counsel during jury deliberations and the return of the verdict is the same standard that was applied to similar errors prior to *Strickland:* whether the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Spencer v. State,* 85 Wis.2d 565, 572–73, 271 N.W.2d 25, 29–30 (1978) (absence at return of the verdict); *Headen v. United States,* 373 A.2d 599, 601 (D.C.1977) (same). *See also United States v. Calabro,* 467 F.2d 973, 988–89 (2d Cir.1972) (absence during portion of jury deliberations and during return of verdicts did not expose defendant to any reasonable possibility of prejudice); *Martin v. United States,* 182 F.2d 225, 227 (5th Cir.) (absence of counsel during return of verdict shown by record to be "merely error without injury"), *cert. denied,* 340 U.S. 892, 71 S.Ct. 200, 95 L.Ed. 647 (1950).[6]

6. We recognize that the lack of counsel at some critical stages may be considered prejudicial *per se,* and may result in automatic reversal of the defendant's convictions without any opportunity

## C. Harmless Error

Our determination of whether counsel's absence was harmless in this case proceeds primarily from our own review of the record of petitioner's trial and the transcript of the habeas hearing held by the district court. We adopt this approach because the district court never expressly evaluated this case under the harmless error standard, and devoted only a very brief portion of its opinion to the actual impact that counsel's absence may have had on the outcome of Siverson's trial. *See Siverson,* 582 F.Supp. at 511–12. Indeed, the district court at one point seemed to conclude that any judicial effort at assessing the true effect of counsel's absence would be improper. *See id.* at 512 ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.") (quoting *Glasser v. United States,* 315 U.S. 60, 76 (1941)). Because we have before us an extensive record providing more than a sufficient basis to perform a meaningful and thorough harmless error analysis in this case, we deem it most appropriate to conduct that analysis now rather than to remand for reconsideration by the district court.

 We are convinced from our review of the record that counsel's absence during both the jury deliberations and the return of the verdicts at petitioner's trial was harmless beyond a reasonable doubt. Beginning with the jury deliberations, we reiterate initially that defense counsel did confer with the trial judge by telephone concerning the request for testimony submitted by the jury at about 9:10 P.M., and expressed no objection to the judge's granting of the request. Since Siverson actually

received defense counsel's advice and assistance, albeit indirectly, on the issue of the jury request, we see no possibility of prejudice whatsoever from the attorney's physical absence at this point in the proceedings. Therefore, the only incidents during the jury deliberations that could have created a potential for prejudice because of defense counsel's absence were the two discussions concerning the length of the deliberations that occurred at approximately 9:45 P.M. and 11:07 P.M.

The lack of defense counsel's input during these two discussions, while very unfortunate, can be deemed actually prejudicial only if we first accept the premise that the jury had already deliberated so long by the time these discussions occurred that the judge's decision to allow the deliberations to continue potentially imperiled the integrity of the jury's processes, such as by forcing the jury to reach a unanimous verdict when they were actually deadlocked. Even if we assume that defense counsel would have persuaded the judge to dismiss the jurors for the evening if counsel had been present and participating in the discussions, this fact would be of no significance to the ultimate outcome of Siverson's trial unless we believe this first premise to be true. Since we find the first premise to be without substantial foundation in the record of this case, we find that counsel's absence during these discussions was harmless error.

When the judge sent the jurors out at approximately 5:40 P.M., he also instructed them that they would be taken to dinner at 6:00 P.M., and that they should not deliberate while at dinner. Thus, while it is true that the jurors in a sense began their deliberations at 5:40 P.M., it is unlikely that they were able to make much headway in the twenty minutes prior to dinner. As-

---

for a harmless error inquiry. *See, e.g., Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (arraignment of defendant in capital case). We hold only that counsel's voluntary absence during jury deliberations and the return of the verdicts in this case is not the kind of Sixth Amendment deprivation that "by its nature, cannot be harmless," and therefore is "subject to harmless error analysis." *See Rush-*

*en v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 455 n. 2, 78 L.Ed.2d 267 (1983) (citations omitted) (per curiam). *See also United States v. DeCoster,* 624 F.2d 196, 256–57 (D.C.Cir.1976) (Robinson, J., concurring) (comparing various situations involving lack of counsel at critical stages in terms of whether harmless error standard applicable).

suming that they took an hour for dinner and resumed deliberating at 7:00 P.M., the jurors had been deliberating for only about two and one-half hours when they submitted their request for testimony at 9:10 P.M. Taking into account the time that it must have taken the court reporter to read back to the jury the requested testimony, which covers fourteen pages of the trial transcript, the jurors could not have deliberated for much more than fifteen minutes by the time the first discussion about the length of deliberations occurred at 9:45 P.M. Thus, a liberal estimate of the time that the jury had spent deliberating by 9:45 P.M. would still come out to under three hours. Finally, if the jury promptly resumed deliberating at 9:45 P.M., its deliberations had only continued for about another hour and twenty minutes when the second discussion occurred at 11:07 P.M. In sum, the jury had deliberated for a total of only a little over four hours by the time of this second discussion.

Given that the jury had eight separate counts to consider, we do not believe that the length of the deliberations in this case gave rise to any reasonable inference of a jury deadlock at the time of either the first discussion at 9:45 P.M. or the second discussion at 11:07 P.M. Without such an inference, there was also no apparent ground for the petitioner to make a mistrial motion, as the trial judge in fact concluded at the end of the second discussion. Thus, defense counsel's absence during these discussions was harmless beyond a reasonable doubt.

We are more troubled, however, by defense counsel's absence when the jury verdicts were returned, because this absence deprived petitioner of the potentially valuable privilege of having the jurors polled individually on their verdicts. Notwithstanding the fact that the jury returned split verdicts, the trial judge did not take the initiative and poll the jury on his own. The judge's failure to poll the jury

thus distinguishes this case from the other cases we have found holding that the absence of counsel at the return of the verdict was harmless error, all of which rely on the fact that the trial judge in fact conducted a poll of the jury. *See United States v. Calabro*, 467 F.2d at 989; *Martin v. United States*, 182 F.2d at 226–27; *Spencer*, 85 Wis.2d at 573, 271 N.W.2d at 29; *Headen*, 373 A.2d at 601. Particularly in a split verdict case, the trial judge's failure to conduct a jury poll in defense counsel's absence places an unfortunate and unnecessary cloud over the verdicts.

It is only the unique circumstances surrounding the jury verdicts in this case that allow us to conclude that the lack of a jury poll, which we assume counsel would have requested and received, was harmless beyond a reasonable doubt. Unlike many split verdict cases where the verdicts are difficult to reconcile and appear to result from jury compromise, the verdicts in this case follow a coherent pattern that reflects discernment rather than compromise by the jury. As respondents pointed out in their oral argument to this court, the jury convicted Siverson on the three counts that did not require the government to prove that he used some kind of weapon, and acquitted him on the five others that did require such proof.[7] Thus, for instance, the jury convicted petitioner of robbery, but acquitted him of armed robbery; convicted him of aggravated battery by causing great bodily harm, but acquitted him of aggravated battery while using a deadly weapon. The verdicts therefore do not suggest a jury split or compromise on the question of Siverson's guilt, but instead indicate a jury decision that the beer bottles Siverson and Childers used to hit Bolig over the head (which were not broken when used) did not qualify as the kind of weapon required as an element of the offenses charged in the other counts.

Since we have already concluded that the jury's deliberations were not suspect be-

---

7. The jury was given a separate verdict form for each of the eight counts of the indictment, and, according to the trial record, the forms were properly signed by each juror and returned to the court.

cause of their length, we find nothing in the record of petitioner's trial to imply an irregularity in the verdicts that might have been uncovered by a jury poll. Under these circumstances, we attach little significance to the testimony of Siverson and his mother at the habeas hearing, which we assume to be true, that several jurors were crying or shaking their heads when the verdicts were returned. As a federal district court recently observed in rejecting an argument that it should have conducted a second poll of the jury because one of the jurors had been crying and shrugging her shoulders during the first poll:

> [A]greement with a verdict does not require pleasure in its announcement. A juror may display unhappiness with a verdict, or reluctance or sadness in its rendition, but still believe in its correctness. A juror may cry over a verdict in which he or she has participated without in any way evidencing disagreement with it. Few jurors relish a finding of guilty.

*United States v. Musto,* 540 F.Supp. 318, 342 (D.N.J.1982). The present case is of course distinguishable from *Musto* in that the judge here failed to poll the jury altogether, and irrespective of our conclusion about whether the jurors' expressions of emotion cast sufficient doubt on their verdicts to justify reversing petitioner's convictions on habeas review, we emphasize that the preferred practice in this case would have been for the court to poll the jury on its own in defense counsel's absence.

The discussion in *Musto* nevertheless makes the general point, equally applicable here, that jurors' expressions of emotion are inherently ambiguous. Thus, for example, the jurors who were crying or shaking their heads at petitioner's trial might have been expressing emotion about the violence and brutality of the crime at issue rather than conveying uncertainty about Siverson's guilt. If other factors were present in this case to raise suspicion about the integrity of the jury verdicts, then the manifestations of emotion by several individual jurors might fit into an overall picture indicating a reasonable possibility of compromised verdicts. Because we have not discovered any other factors to create such doubt in this case, however, these ambiguous expressions of emotion do not create a basis for believing that the verdicts would have been impeached if the court had conducted a poll of the jurors individually.

We therefore hold that counsel's absence during the deliberations and the return of the verdicts in this case was harmless beyond a reasonable doubt. In so holding, however, we do not claim to be without any doubt whatsoever as to whether the presence of counsel would have made a difference in this case. The task of reconstructing what occurred—or might have occurred—during a trial is always difficult, and all the more so when we must guess at what transpired in the confines of the jury deliberation room. We cannot rule out completely the possibility that if the jurors had been sent home earlier and/or if they had been polled, the result of Siverson's trial might have been different. *See Siverson,* 582 F.Supp. at 512 (facts in case "leave a doubt as to whether a polling of the jury would have revealed a coerced verdict").

Nevertheless, as Judge Coffin stated for the First Circuit in an opinion holding that the absence of defense counsel at the defendant's arraignment was harmless error under *Chapman:* "This possibility does not in our opinion rise to the level of that kind of doubt which, as judges instruct juries, would cause reasonable men to hesitate in making an important decision in their own lives." *Chin Kee v. Commonwealth of Massachusetts,* 407 F.2d 10, 15 (1st Cir.), *cert. denied,* 395 U.S. 982, 89 S.Ct. 2143, 23 L.Ed.2d 770 (1969). Rather, we are firmly convinced that the possibility that petitioner was prejudiced by the absence of counsel in this case is "merely speculative or hypothetical," and thus does not require the reversal of petitioner's convictions. *Id.* at 14. *Accord Moses v. Helgemoe,* 562 F.2d 62, 64–65 (1st Cir.1976); *Anderson v. United States,* 352 F.2d 945, 947 (D.C.Cir.1965); *State v. Mills,* 107

Wis.2d 368, 372, 320 N.W.2d 38, 40 (Wis.Ct. App.1982).

For these reasons, the district court's order granting the petition for a writ of habeas corpus is reversed and the case remanded to the district court with directions to enter an order denying the petition.